CHICAGO AND NORTH WESTERN RAILWAY COMPANY, Plaintiff-Appellee, *v*. PEORIA AND PEKIN UNION RAILWAY COMPANY, Defendant-Appellant.

Third District    No. 75-38

Opinion filed January 20, 1977.—Rehearing denied March 21, 1977.

96

Sidley & Austin, of Chicago, and Westervelt, Johnson, Nicoll & Keller, of Peoria (David P. List, of counsel), for appellant.

Warden, Daley & Brant, of Chicago, and Swain, Johnson & Gard, of Peoria (George H. Brant, of counsel), for appellee.

Mr. JUSTICE BARRY delivered the opinion of the court:

The action underlying this appeal was brought by the Chicago and North Western Railway Company (C&NW) charging the defendant, Peoria and Pekin Union Railway Company (P&PU) with breach of contract. Both parties filed motions for summary judgment. The trial court denied the motion of P&PU and granted that of C&NW. Subsequently, the trial court awarded C&NW damages in the amount of $487,349.26. P&PU now appeals.

The September 12, 1946, contract, which is the basis of this action, recites that the "same provisions, stipulations and conditions of * * * [an]

* * * original contract of December 1, 1911 as interpreted, modified and extended" would be binding on the parties until February 1, 1981. This agreement was approved by the Interstate Commerce Commission as just and reasonable and consistent with the public interest. I.C.C. Finance Docket No. 15354 (August 26, 1946).

These contracts gave the plaintiff the nonexclusive right to use the defendant's terminal facilities at Peoria and the defendant's connecting facilities through Peoria and Pekin to other railroads and the local industries, including the use of a railroad bridge across the Illinois River. For this right, the plaintiff agreed to pay rent and maintenance charges on the facilities it utilizes. To determine the maintenance charges, the entire area, commonly known as the Peoria-Pekin Switching District, was divided into districts. The contracting or "tenant" railroads agreed to pay that proportion of the maintenance for each district equal to that ratio of each railroad's cars passing through any one district to the total cars passing through any one district. However, this contract also stated that cars "switched" by P&PU were not to be included in the total for the purpose of determining maintenance charges.

In addition, these contracts provided that each tenant railroad should contribute a just proportion of the dispatching expenses of P&PU. This proportion was to be determined by the ratio of the number of "trains" of the tenant railroad dispatched to the total number of "trains" dispatched. An engine plus a tender car, even without other cars, was to be considered a "train."

The C&NW was a party to this contract. However three railroads using the P&PU facilities also used by C&NW were not tenant railroads. These railroads are the Rock Island and Pacific Railroad Company (Rock Island), the Burlington Northern, Inc. (Burlington), and the Peoria Terminal. The Interstate Commerce Commission has previously approved of the P&PU decision to allow nontenant railroads to operate over P&PU properties (*Rates, Regs. & Practices of Peoria & Pekin Union Ry.*, 93 I.C.C. 3 (1924)), and established the charges to be levied for the transfer or switching services provided to these railroads (*Rates, Regs. & Practices of Peoria & Pekin Union Ry.*, 115 I.C.C. 469 (1926); *Rates, Regs. & Practices of Peoria & Pekin Union Ry.*, 118 I.C.C. 127 (1926)).

In its third amended complaint, C&NW alleged that P&PU collected overpayments from the plaintiff for the 10 years[1] preceding the filing of the complaint because the defendant wrongfully failed to count the cars and trains of all other railroad (nontenants and P&PU movements) using the same P&PU facilities as used by the plaintiff when billing and

---

[1] The reasons only 10 years are involved is not because the practice occurred only in the last 10 years, but because of a statute of limitations.

collecting the plaintiff's pro rata contributions toward the maintenance and dispatching expenses. The plaintiff estimated the overpayments as $3,500 per month for maintenance and $300 per month for dispatching. The judgment sought was the aggregate amount of the estimated overpayments plus 6% interest.

The defendant's answer admits that its method of computing the maintenance and dispatching expenses was as the plaintiff described, but the answer denied that this is a breach of contract. The factual bases for this contention by P&PU are several. First, this practice of computing the maintenance and dispatching expenses was utilized by P&PU for over 50 years. Secondly, all the C&NW accounts for the preceding 10 years had been stated and settled. Thirdly, since 1948, the defendant's method of apportioning expenses has been reviewed and approved, from time to time, by a "Joint Facility Audit Committee" established by the defendant and all the tenant railroads. That committee always included a representative of C&NW. Nevertheless, no exceptions or objections were ever made to the defendant's method of apportionment. Furthermore, on at least one occasion, a C&NW auditor was assigned by the "Joint Facility Audit Committee" to review the P&PU apportionment of maintenance expenses. Fourthly, the plaintiff has been a shareholder of the defendant since 1902 and has had a representative on P&PU's board of directors since before 1911. During this entire period, the record of P&PU were available to C&NW for inspection.

■■■ At the outset the defendant-appellant argues that the circuit court was without jurisdiction to enter summary judgment in favor of plaintiff. P&PU contends that the question of altering contractual relationships between railroads must first be resolved by the I.C.C. We disagree. The question presented in the instant case does not relate to transportation policy or to the reasonableness of tariffs but involves only a matter of pure contract construction. The United States Supreme Court in holding that when the issues of construction and reasonableness of tariffs are so intertwined that the same facts are determinative of both issues the matter should initially be determined by the I.C.C. stated, "By no means do we imply that matters of tariff construction are never cognizable in the courts." (*United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 69, 1 L. Ed. 2d 126, 135, 77 S. Ct. 161, 167-68 (1956).) The I.C.C., in fact, approved the contract involved as reasonable here (the 1946 supplemental agreement) which will continue in effect until 1981. The I.C.C.'s view that the applicable Federal statute (49 U.S.C. § 5(2)) does not authorize it to interpret contracts which it formerly approved finds additional judicial acknowledgment and approval in *Texas & New Orleans R.R. Co. v. Brotherhood of Railroad Trainmen*, 307 F.2d 151 (5th Cir. 1962), *cert. denied*, 371 U.S. 952, 9 L. Ed. 2d 500, 83 S. Ct. 508

(1963), which reaffirmed that carriers must rely upon applicable contract and corporate law to resolve questions of interpretation and enforcibility of contracts. P&PU also claims lack of jurisdiction in the circuit court because the claim involves a collateral attack upon I.C.C. earlier rulings in earlier disputes between parties with similar interests charging unfair discrimination by P&PU between tenants and nontenants. The pleadings, however, do not disclose any allegation of discrimination and in fact the P&PU does charge for services rendered to nontenants.

The sole issue, which must be resolved to settle what is essentially a contractual dispute, is whether the trial court correctly found that P&PU had violated the terms of the parties' contract. A judicial interpretation of the contract language and effect is imperative. The basic issues here are the meaning of the words "cars switched by the P&PU" and "trains" as used in the contract. The C&NW argues a breach of the contract because cars moved by the P&PU for the nontenant railroad lines of the Burlington and Rock Island are excluded from the count of cars and trains moved by the P&PU for tenant railroad lines, like the C&NW, in computing track maintenance and dispatching expenses. The contract between only the P&PU and its tenants provides that cars switched by the P&PU shall not be included in computing maintenance expense chargeable to the tenants of P&PU. The P&PU's operations are currently considered to be either industrial or intermediate switching operations and its principal revenue comes from those two switching movements. All the P&PU movements take place within an area designated as the Peoria-Pekin switching district. Through all the years since the execution of this contract in 1911 only those switching movements of cars for tenant railroads have been counted and included in the maintenance expense. Consistently throughout the years the parties have not included for maintenance expense purposes the movement of cars by the P&PU in actual switching of nontenant railroads in the computation of the maintenance expense. This switching for nontenant lines was charged by P&PU under tariffs approved by the I.C.C. This contract under which the parties had operated since 1911 was extended in 1946 to the year 1981 "as interpreted modified and extended." This supplemental agreement as extended was approved by the I.C.C. upon the application of the C&NW.

■■ We are convinced that the pertinent contract language is ambiguous and unclear when read solely within the four corners of the document. It appears that technical terms such as "switching" and "trains" have no universally clear meaning throughout the railroad industry. The meaning of such terms is dependent on the particular circumstances, including the relationship of the carriers and the geographic limits in which service is performed. We must resort to the various rules of

contract interpretation to discover the intention of the contracting parties. The Restatement (Second) of Contracts § 228(4) (Tent. Drafts Nos. 1—7, 1973) provides, "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." The parties to an agreement are in the best position to know what they meant, and their action under the contract is often the strongest evidence of their intended meaning. (See *Pocius v. Halvorsen*, 30 Ill. 2d 73, 195 N.E.2d 137 (1963).) The parties to the 1911 contract and the 1946 supplemental agreement through their course of conduct evidenced a settled construction that the interchange of cars with nontenants was switching while the car movements or transfers for tenants are made and governed pursuant to the shared maintenance and dispatching expenses under the parties joint trackage nonexclusive lease agreement. In addition, we find historically, from the record of the conduct and acts of various railroads prior and subsequent to the merger of the Pekin switching districts and Peoria-East Peoria switching districts, justification for our determined distinction between switching and transferring.

■■ C&NW has consistently participated in reviewing and approving the method of allocating maintenance and dispatching expense of P&PU by being a part of the "Joint Facility Audit Committee." This participation and approval of the settled course of conduct by P&PU in determining the proportion of maintenance and dispatching expense amounts to acquiescence in that course of conduct. Further, C&NW is a stockholder in the P&PU and has had a member on the board of directors of P&PU since before 1911. These facts as disclosed by the record cause us to conclude that C&NW had available to them throughout the term of the contract sufficient financial and accounting data to impart a knowledge of the past course of conduct sufficient to decide now that C&NW's failure to object throughout more than 50 years is acquiescence and implied approval of the conduct of P&PU. In *New York Central Development Corp. v. Byczynski*, 95 Ill. App. 2d 474, 477, 238 N.E.2d 414, 416 (1968), involving an interpretation of the ambiguous language of a contract, we stated, " 'There is no more convincing evidence of what the parties intended [by a contract] than to see what they did in carrying out its provisions.' [Citations.]"

■■ The case of *Chicago & W.I. Ry. Co. v. Chicago & E.I. Ry. Co.*, 86 F.2d 441 (7th Cir. 1936), is strikingly similar to the facts of the case at bar. There the court held that the ambiguous language in a contract could be interpreted by the settled past conduct of the two railroads involved so that the special assessments for the cost of permanent improvements

would be included in the term working expenses as those words were used by the parties in a joint trackage lease agreement. The C&NW calls our attention to a later case involving the same parties to the same contract again in a dispute over the contract's meaning (*In re Chicago & E.I. Ry. Co.*, 94 F. 2d 296 (7th Cir. 1938)). In the later case the court concluded that the contract terms which included within the working expenses "all taxes and assessments, ordinary and extraordinary" were clear and unambiguous and that extrinsic circumstances, such as past conduct of the parties, could not be used to contradict and vary the terms of the contract from their ordinary, clear, and unambiguous meaning. The court there determined that capital stock tax was included within the language of the contract and would not admit the parties past conduct to the contrary to vary the otherwise clear terms of the contract. This case is distinguishable. The contract language before us is not clear and unambiguous on its face. The term "switching" and "trains" have varied technical meanings dependent upon the context in which they are used. Having determined the specific contract language ambiguous we must resort to the most reliable evidence of the parties intent, their actual conduct in performing the contract. *Chicago & W.I. Ry. Co. v. Chicago & E.I. Ry. Co.*, 86 F.2d 441 (7th Cir. 1936), is controlling. The practices of the parties in this case have defined the terms of the contract. We believe the trial court incorrectly interpreted the contract by taking a contradictory view and in entering summary judgment for plaintiff.

■■ Both parties, by filing motions for summary judgment, admit there are no material issues of fact. (*Allen v. Meyer*, 14 Ill. 2d 284, 152 N.E.2d 576 (1958).) Therefore, pursuant to our powers as enumerated in Supreme Court Rule 366 (Ill. Rev. Stat. 1975, ch. 110A, par. 366), we reverse the judgment of the Circuit Court of Peoria County and grant the defendant's motion for a summary judgment.

Reversed and summary judgment granted in favor of the Peoria and Pekin Union Railway Company.

STENGEL, P. J. and STOUDER, J., concur.