(No. 97873.—

THE HOME INSURANCE COMPANY, Appellant, v.
THE CINCINNATI INSURANCE COMPANY, Ap-
pellee.

*Opinion filed December 2, 2004.*

Pretzel & Stouffer, Chrtd., of Chicago (Robert Marc Chemers and Daniel G. Wills, of counsel), for appellant.

Daniel G. Litchfield and Mitchell H. Frazen, of Litchfield Cavo, of Chicago, for appellee.

Joseph P. Postel, of Meachum, Spahr, Cozzi, Postel & Zenz, of Chicago, for *amicus curiae* Liberty Mutual Insurance Group.

JUSTICE THOMAS delivered the opinion of the court:

The Home Insurance Company (Home) brought a two-count declaratory judgment action against the Cincinnati Insurance Company (Cincinnati), attempting to recover money paid to settle an underlying personal injury action. On cross-motions for summary judgment, the circuit court of Cook County granted Cincinnati's motion on both counts and denied Home's motion. The appellate court, with one justice dissenting, affirmed the circuit court. 345 Ill. App. 3d 40. We allowed Home's petition for leave to appeal (177 Ill. 2d R. 315). We also allowed Liberty Mutual Insurance Company to file an *amicus* brief in support of Home (155 Ill. 2d R. 345(a)). For the reasons that follow, we affirm in part and reverse in part.

## BACKGROUND

Allied Asphalt Paving Company (Allied) was the general contractor for a renovation project on the

Kennedy Expressway. Allied subcontracted work on the project to Aldridge Electric Company, Inc. (Aldridge), and Western Industries, Inc. (Western). Matthew Fisher, an employee of Aldridge, was injured while installing lights in an underpass on the project. The accident occurred at 2 a.m., when an intoxicated driver drove through the construction area and struck Fisher.

Fisher sued numerous parties, including Allied and Western. In his third amended complaint, Fisher alleged that Allied and Western had agreed to assume responsibility for all safety aspects of the project, and that Allied and Western breached their duty to provide proper safety signs, traffic cones, barricades, warning lights, flagmen, and other traffic control devices at the location where he was working.

At the time of the accident, Allied was named as an additional insured under two insurance policies: a commercial liability policy issued to Western by Cincinnati; and a policy issued to Aldridge by Home. Each policy contained a $1 million limit of liability for each occurrence. Additionally, each policy contained the following endorsement:

"WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of 'your work' for that insured by or for you."

The term "your work" was defined as follows under each policy:

"a. Work or operations performed by you or on your behalf, and

b. Materials, parts or equipment furnished in connection with such work or operations."

It is undisputed that Home's policy was an excess policy, while Cincinnati's was a primary policy.

Allied tendered the defense of the Fisher action to both Cincinnati and Home. In a June 23, 1997, letter, Cincinnati accepted the defense of Allied, but reserved

its rights to deny coverage with respect to any work or conduct that was not performed by Western on behalf of Allied. In a September 14, 1999, letter, Home accepted the defense of Allied. However, Home's acceptance letter stated that Home "will agree to share the cost of Allied's defense and indemnity with the insurance carrier for Western *** on a 50/50 basis subject to a review of both policies and any reservation of rights."

In October 1999, Cincinnati settled Fisher's claim against Western for $40,000. Thereafter, Fisher agreed to settle his suit against Allied for $600,000. Home paid $500,000 toward this settlement, but Cincinnati paid only $100,000 of the total settlement amount.

On November 8, 2000, Home filed the present declaratory judgment action, asserting theories of equitable subrogation and equitable contribution. Count I sought a declaration that Cincinnati was the sole primary insurer responsible for the defense of Allied and was thus liable to Home for the entire amount Home paid toward the settlement. Count II sought a declaration that it was entitled to recover from Cincinnati the amount it paid in excess of its *pro rata* share of the settlement.

Thereafter, Home took the evidence depositions of Richard Johnson, Allied's defense counsel, and David Cunningham, Cincinnati's claim manager. Johnson testified in his deposition that by the time of trial, Fisher's theory had evolved to rely more heavily on the fact that the injury was caused by a lack of a flagger at the site. Flagging was not Western's responsibility. Rather, Western was responsible for properly placing barricades at the site. It was Johnson's guess that Western would probably not be found liable at all—this was because none of the evidence showed a lack of compliance with Illinois Department of Transportation specifications on barricades. He assessed the probability of a finding of li-

ability against Western at no more than 20%. But Johnson also did not think much of the lack-of-a-flagman theory as it pertained to Aldridge's work, stating that it was "off the wall" and "almost bordered on being ludicrous." Accordingly, Johnson assessed the potential that Allied would be found liable at all at only 10 to 20%.

Cunningham testified in his deposition that he agreed with Johnson's assertion that there was up to a 20% chance that Allied would be found liable, that the verdict potential was between two to three million, and that $600,000 was a reasonable settlement amount. Cunningham also admitted that Cincinnati's payment of $40,000 to settle on behalf of Western was based at least in part on the possibility that Western might lose its pending summary judgment motion and be found liable at trial. He refused to give a percentage of the possibility of Western being found liable, stating instead that he felt there was a "slim" chance. By settling on behalf of Western, Cunningham wanted to insure that no finding would ever be made that Western was liable. Cunningham admitted that if the jury had made a finding of liability against Western on the verdict form, Cincinnati's policy, listing Allied as an additional insured, would be triggered. But Cunningham believed Cincinnati would owe only for the portion of damages that arose out of Western's work. He had no idea, however, how that would be determined at trial, and he had never seen a case where fault was apportioned between insurance companies as he suggested it should be. He acknowledged that such "arising out of" language, as is contained in Cincinnati's policy, is read very broadly by courts in favor of coverage.

Cunningham further testified in his deposition that he refused to pay any more than $100,000 toward the settlement. At the time of his refusal, he offered to arbitrate the allocation issue.

Home filed the affidavit of Joan Kenchik, stating that she was the claim manager for Home that handled the Fisher settlement. She attempted on several occasions to persuade Cincinnati to contribute more than $100,000 toward the settlement, but it refused. Home was thus forced to pay all of the remainder of the settlement amount. Home made this payment, however, on the condition that Cincinnati agree to arbitrate Home's claims. According to her affidavit, it was Home's position that it was entitled to at least equal contribution from Cincinnati or, depending upon on whether the Cincinnati policy contained an "other insurance" clause, complete indemnification from Cincinnati. The affidavit does not indicate whether or not Home ever communicated to Cincinnati that it was entitled to full reimbursement for the settlement as an excess insurer. Kenchik's affidavit further notes that, while Cincinnati agreed to arbitrate at the time of settlement, it later refused her requests to arbitrate.

Home filed as an exhibit a letter written by Kenchik to Cunningham dated October 21, 1999, which was shortly after the settlement. In the letter, Home agreed to arbitrate the issues of indemnification. Home also filed a response letter from Cunningham dated October 27, 1999, stating that Cincinnati had not unqualifiedly agreed to arbitrate. It also asked Home to specify the legal basis on which it was seeking reallocation of the settlement award.

The circuit court granted Cincinnati's motion for summary judgment and denied Home's cross-motion for summary judgment. The court found that Home was not entitled to equitable contribution from Cincinnati because Home's policy was excess and Cincinnati's policy was primary, and excess and primary insurers do not insure the same risk. The court also denied the equitable subrogation claim, finding that Home waived it by not

asserting that it had no duty to defend Allied and by not asserting that it was an excess insurer until filing the declaratory judgment action.

With one justice dissenting, the appellate court affirmed the circuit court's result (345 Ill. App. 3d at 48), but did not address the circuit court's waiver theory to resolve the subrogation claim of count I. Instead, the appellate court employed the equitable *contribution* analysis of the Appellate Court, First District, in *Schal Bovis, Inc. v. Casualty Insurance Co.*, 315 Ill. App. 3d 353 (2000), to resolve the equitable *subrogation* count. 345 Ill. App. 3d at 45-46. In discussing whether Home and Cincinnati were liable for the "same loss," a necessary element to maintain an equitable contribution claim, the appellate court adopted the analysis of *Schal Bovis*, which held that the policies at issue in that case insured "different risks" for purposes of equitable contribution because each insurer insured the additional insured only to the extent that liability arose out the work of the respective underlying named insureds. 345 Ill. App. 3d at 45-46, citing *Schal Bovis*, 315 Ill. App. 3d at 363. The appellate court here found that because the policies did not insure the "same risk," they therefore did not cover the "same loss" for purposes of an equitable subrogation count. 345 Ill. App. 3d at 46. Accordingly, it found that Home was not entitled to equitable subrogation as a matter of law. 345 Ill. App. 3d at 46.

The appellate court then turned to the equitable contribution claim of count II. It noted that it had already found that the policies did not insure the same risk because of the respective "arising out of 'your work' " endorsements. 345 Ill. App. 3d at 47. It therefore found that summary judgment was properly granted to Cincinnati on this count. 345 Ill. App. 3d at 47. In so finding, the appellate court refused to adopt the reasoning of the Third District of the appellate court in *Cincinnati Insur-*

*ance Co. v. River City Construction Co.*, 325 Ill. App. 3d 267 (2001), a case which declined to follow the *Schal Bovis* rule given the circumstances before it. As an alternative basis for its ruling granting summary judgment on count II, the appellate court noted that the policies did not insure the same risk because one was an excess policy and the other was a primary policy. 345 Ill. App. 3d at 48.

## ANALYSIS

Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2002); *Hall v. Henn*, 208 Ill. 2d 325, 328 (2003); *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 349 (1998). The standard of review for the entry of summary judgment is *de novo*. *Hall*, 208 Ill. 2d at 328. We may affirm a grant of summary judgment on any basis appearing in the record, regardless of whether the lower courts relied upon that ground. *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 261 (2004); *Harrison v. Hardin County Community Unit School District No. 1*, 197 Ill. 2d 466, 475 (2001) (Harrison, C.J., specially concurring, joined by Kilbride, J.).

### I. Equitable Contribution

We will first address Home's arguments on the equitable contribution issue. It essentially argues that the appellate court read the requirements of an equitable contribution claim too narrowly.

We begin our analysis with a general discussion of contribution in the context of multiple insurers. The terms "contribution," "indemnification" and "subrogation" are often used interchangeably, but there are

distinct differences between them. 15 Couch on Insurance 3d § 217:5 (rev. 2004). The remedies of contribution and indemnity are mutually exclusive, and contribution is prohibited where a party has a right to indemnity. 18 C.J.S. *Contribution* § 26, at 30 (1990). Contribution as it pertains to insurance law is an equitable principle arising among coinsurers which permits one insurer who has paid the entire loss, or greater than its share of the loss, to be reimbursed from other insurers who are also liable for the same loss. *Cincinnati Cos. v. West American Insurance Co.*, 183 Ill. 2d 317, 322 (1998); *Royal Globe Insurance Co. v. Aetna Insurance Co.*, 82 Ill. App. 3d 1003, 1005 (1980); 15 Couch on Insurance § 217:5 (rev. 2004). Contribution applies to multiple, concurrent insurance situations and is only available where the concurrent policies insure the same entities, the same interests, and the same risks. *Royal Globe*, 82 Ill. App. 3d at 1005; 15 Couch on Insurance 3d § 218:3 (rev. 2004). These elements must be met before the insurance can be considered concurrent or double. 15 Couch on Insurance 3d § 218:3 (rev. 2004). Accordingly, when two insurers cover separate and distinct risks there can be no contribution among them. 15 Couch on Insurance 3d § 218:3 (rev. 2004).

In contrast to contribution, subrogation and indemnification are devices for placing the *entire* burden for a loss on the party ultimately liable or responsible for it and by whom it should have been discharged. 15 Couch on Insurance 3d § 217:5 (rev. 2004). Indemnification differs from subrogation in that the entity seeking indemnification does so in its own right, while in the latter the subrogee succeeds to another's right to payment. 15 Couch on Insurance 3d § 217:5 (rev. 2004).

It is well settled that the doctrine of equitable contribution is not applicable to primary/excess insurer issues. *River City*, 325 Ill. App. 3d at 274 (it is well

established that excess insurers cannot seek equitable contribution from primary insurers); *Schal Bovis*, 315 Ill. App. 3d at 363 (same); *Home Indemnity Co. v. General Accident Insurance Co. of America*, 213 Ill. App. 3d 319, 321 (1991); *United States Fidelity & Guaranty Co. v. Continental Casualty Co.*, 198 Ill. App. 3d 950, 955 (1990); *Reliance National Indemnity Co. v. General Star Indemnity Co.*, 72 Cal. App. 4th 1063, 1078, 85 Cal. Rptr. 2d 627, 635 (1999); 15 Couch on Insurance 3d § 218:7 (rev. 2004). This is because by definition the policies do not cover the same risks—the protections under the excess policy do not begin until those of the primary policy cease. *Home Indemnity*, 213 Ill. App. 3d at 321; *United States Fidelity & Guaranty*, 198 Ill. App. 3d at 955.

Here, it is undisputed that Home's policy was excess and Cincinnati's was primary. Applying the well-settled rule, we find that Home could not recover on its equitable contribution claim because the two policies insured different risks. The very case that Home places its greatest reliance on in this appeal—*River City*—found that an excess insurer cannot recover from a primary insurer under an equitable contribution theory because they insure different risks. See *River City*, 325 Ill. App. 3d at 274. Undaunted, Home claims that "many courts have held [that] the rule is narrower—that is, *primary* insurers may not obtain equitable contribution from *excess* insurers." For this proposition, Home cites *Schal Bovis*, 315 Ill. App. 3d at 369-70, *Home Indemnity*, 213 Ill. App. 3d 319, and *United States Fidelity & Guaranty Co.*, 198 Ill. App. 3d 950. But none of these cases stand for the proposition for which Home cites them. Instead, each of these cases noted that equitable contribution is not applicable to excess/primary insurer issues, and in *Schal Bovis*, the court specifically stated that "an excess insurer cannot seek equitable contribution from a

primary insurer." *Schal Bovis*, 315 Ill. App. 3d at 363. Home fails to cite any Illinois case (or any other reported case for that matter) that has held that the rule is narrower.

The fact that Home was an excess carrier and Cincinnati was a primary carrier is enough to end the analysis on the equitable contribution claim. But Home engages in a lengthy argument as to whether the two insurers insured the same risk in view of the "arising out of 'your work' " endorsement language in the respective policies. It contends that the appellate court should not have relied upon *Schal Bovis* to find a lack of identity in the risks insured, but instead should have relied upon *River City* and found that the two policies insured the same risk. It maintains that by not doing so, the appellate court created an irreconcilable conflict between the First and Third Districts. Because the instant appellate court considered the "arising out of 'your work' " endorsement as an independent and indeed the main basis for denying the claim and because it applied the same analysis to the equitable subrogation claim, we will address Home's argument on this point.

Relying on *Schal Bovis*, the appellate court concluded that the risk that plaintiff might be injured in connection with Aldridge's work is a different risk from that associated with someone being injured in connection with Western's work. In *Schal Bovis*, a construction worker sued Buck (the owner of the site, who was insured by Northbrook), Schal (the general contractor, who was also insured by Northbrook), Ozark (insured by Wausau), Ranken (insured by Great American), Alcan (insured by Casualty), and Chicago Forming (insured by American Estates). Plaintiff obtained a judgment against Schal, Buck and Ozark for $2.8 million. Plaintiff had voluntarily dismissed Alcan and Chicago Forming from its suit, but they remained in the action as third-party defen-

dants. The jury was not asked to apportion fault, but it did return directed verdicts for the third-party defendants on the basis that they were not in charge of the work. Three of the five insurers satisfied the judgment, but two paid nothing: Casualty and American States, who were the insurers of the third-party defendants. All of the policies listed Buck as an additional insured, but the Casualty and American States policies contained "arising out of 'your work' " endorsements similar to the ones in the present case. Northbrook was an excess insurer relative to the other insurers in the case, and the other insurers were primary with respect to each other.

*Schal Bovis* found that Northbrook could not seek equitable contribution, applying the well-settled rule that an excess insurer may not seek recovery from a primary insurer. *Schal Bovis*, 315 Ill. App. 3d at 363. The court then concluded that Great American and Wausau were also precluded from seeking equitable contribution from Casualty and American States. *Schal Bovis*, 315 Ill. App. 3d at 363. The court's rationale was as follows:

"Although the Great American policy covered Schal and Buck as additional insureds, it did so only to the extent that Schal's and Buck's liability arose out of Ranken's work. The Wausau policy covered Schal and Buck from liability, but only when that liability arose out of Ozark's work. Clearly, the risk that a plaintiff might be injured in connection with Ranken's work is a different risk than the risk that a plaintiff might be injured in connection with Ozark's work. These risks are, in turn, different than the risks associated with a plaintiff being injured in connection with Alcan's work or in connection with Chicago Forming's work (as is required by the Casualty and American States policies). Thus, because each insurer insured substantively different risks, each is precluded from seeking equitable contribution from the others." *Schal Bovis*, 315 Ill. App. 3d at 363.

The appellate court in the case before us noted that *River City* declined to follow *Schal Bovis*. 345 Ill. App. 3d

at 47. After discussing *River City*, the appellate court here chose to follow *Schal Bovis*. 345 Ill. App. 3d at 48.

In *River City*, Modugno, an injured worker, sued Caterpillar and River City in connection with an injury he sustained while working for his employer, Illinois Piping, on the premises of Caterpillar. River City installed tanks and grating around the tanks for Caterpillar, but had failed to install a temporary or permanent handrailing as required by contract. Modugno was required to use the grating to access his jobsite. He lost his balance and was injured while on the grating. Auto Owners insured River City, and Cincinnati insured Illinois Piping. Both insurers insured Caterpillar as an additional insured, and both policies had "arising out of your work" language. Cincinnati settled the suit, releasing all claims against Caterpillar, Illinois Piping and River City.

The *River City* appellate court held that the trial court erred in dismissing Cincinnati's equitable contribution claim against Auto Owners. *River City*, 325 Ill. App. 3d at 274. It noted that Modugno was injured while performing work for Illinois Piping on grating erected by River City. Thus, there was sufficient identity of insurable interests to support an equitable contribution claim. *River City*, 325 Ill. App. 3d at 274. The court refused to follow the *Schal Bovis* rule, noting it would unfairly protect Auto Owners from paying for the benefit it received—release from liability. *River City*, 325 Ill. App. 3d at 275.

Although *River City* found that there was sufficient *identity of interests*, it did not discuss whether the policies insured the *same risk*. Instead, it avoided consideration of the requirement, finding instead that coverage need not be identical in all respects. *River City*, 325 Ill. App. 3d at 274. *River City* is also factually distinguishable from both the present case and *Schal Bovis* because in *River City* it could not be disputed that the work of

River City, who was insured by the nonsettling insurer (Auto Owners), was directly responsible for the liability of the additional insured (Caterpillar). The *River City* court apparently believed that because of the clear responsibility of *River City* for the accident, the equities of the case obviated any need for a close examination of the respective risks insured by the two insurers. See *River City*, 325 Ill. App. 3d at 275 (the rule in *Schal Bovis* would unfairly protect Auto Owners from paying for the benefit it received—release from liability).

Home and *amici* essentially argue that this court should follow *River City*. They contend that the instant appellate court incorrectly proceeded from the premise that the two policies each covered Allied for its liability arising out of a different subcontractor's work, to the conclusion that they therefore covered different risks. According to Home, the appellate court falsely assumed that Allied's liability could have only arisen out of one of the subcontractor's work, but not the others. A court should assume that the injured worker would have prevailed against either party sued in the complaint. See *The Home Insurance Co. v. Certain Underwriters at Lloyd's London*, 729 F.2d 1132, 1134 (7th Cir. 1984).

Cincinnati, on the other hand, argues that the two policies covered substantially different risks because of the additional insured endorsements. Fisher was an employee of Aldridge, so no matter how the injury transpired, Allied's liability arose out of Aldridge's work. In contrast, the same cannot be said about Western's role in the case. Thus, the policies insured different risks.

We believe that the two policies at issue covered substantially different risks and therefore equitable contribution was not available. The term "risk" is not defined by the policies, so the commonly understood dictionary definition is applicable. *People ex rel. Daley v. Datacom Systems Corp.*, 146 Ill. 2d 1, 15 (1991). "Risk,"

as it is used in the policies at issue, is defined by Webster's as "the possibility of loss or injury." Merriam Webster's Collegiate Dictionary 1011 (10th ed. 1996). It is also defined as "the chance of loss" or the "degree of probability of such loss." Webster's Third New International Dictionary 1961 (1993); see also Black's Law Dictionary 1328 (6th ed. 1990) (the degree of hazard; a specified contingency or peril. In general, the element of uncertainty in an undertaking). The policies clearly covered different possibilities or degrees of probability for suffering harm or loss. The Cincinnati policy covered Allied only for liability arising out of Western's work, while the Home policy covered Allied only for liability arising out of Aldridge's work. Although it was possible that both policies would one day be triggered because Allied's liability for an accident arose out of both Western's *and* Aldridge's work, this is a different question than whether the policies set out to cover the same risk. Clearly, under the terms of either policy Allied would be covered 100% if liability arose at all out of the work of the named insured, no matter how slight. Furthermore, any determination that either Western or Aldridge were not liable in tort for Fisher's injury is quite a different question than whether or not the policies were triggered because Allied's liability arose out of the work of Western or Aldridge within the meaning of the respective policies. See *Schal Bovis*, 315 Ill. App. 3d at 368 (a finding that a party is not in charge of the work is different from a finding that injuries did not arise out of that party's work). But again, just because both policies may have been triggered so as to provide coverage does not mean that the policies set out to cover the same risk. Accordingly, we believe that *Schal Bovis* is the better reasoned case, and to the extent that *River City* is inconsistent, it is overruled.

## II. Equitable Subrogation

Having determined that the lower courts properly

denied Home's claim for equitable contribution because the Home policy was excess to Cincinnati's primary policy and because the policies did not insure the same risks, we now consider Home's claim for equitable subrogation. Home argues that the appellate court incorrectly applied the "identity of risk" requirement, applicable to claims of equitable *contribution*, to deny Home's claim for equitable *subrogation*.

The appellate court correctly noted the elements of an equitable subrogation claim as follows: (1) the defendant carrier must be primarily liable to the insured for a loss under a policy of insurance; (2) the plaintiff carrier must be secondarily liable to the insured for the *same loss* under its policy; and (3) the plaintiff carrier must have discharged its liability to the insured and at the same time extinguished the liability of the defendant carrier. 345 Ill. App. 3d at 44, citing *North American Insurance Co. v. Kemper National Insurance Co.*, 325 Ill. App. 3d 477, 481 (2001); *State Farm General Insurance Co. v. Stewart*, 288 Ill. App. 3d 678, 686-87 (1997). However, in discussing whether Home and Cincinnati were liable for the "same loss," the appellate court relied upon the equitable *contribution* analysis of *Schal Bovis*. 345 Ill. App. 3d at 45-46. As we have already explained, *Schal Bovis* found that the two policies at issue insured different risks for equitable *contribution* purposes because each insurer insured the additional insured only to the extent that liability arose out the work of the respective underlying named insureds. Here, however, the appellate court found that because the Home and Cincinnati policies did not insure the "same risk," they therefore did not cover the "same loss" for purposes of an equitable *subrogation* claim. 345 Ill. App. 3d at 46.

We find that the appellate court erred in equating the "identity of risk" element of a contribution claim with the "same loss" requirement of a subrogation claim.

As Home correctly points out, the appellate court either overlooked or ignored that *Schal Bovis* found that the excess insurer in that case, who was in the same position as Home here, *would be* entitled to equitable *subrogation*. *Schal Bovis*, 315 Ill. App. 3d at 364. There, the court noted the following:

> "In addition to seeking equitable contribution, Northbrook and its insureds (Schal and Buck) sought reimbursement from Casualty and American States. An action by an excess insurer seeking reimbursement from primary insurers is a distinct remedy, different than equitable contribution. See, *e.g., New Amsterdam Casualty Co. v. Certain Underwriters at Lloyds, London*, 34 Ill. 2d 424, 216 N.E.2d 665 (1966); *Home Indemnity Co. v. General Accident Insurance Co.*, 213 Ill. App. 3d 319, 572 N.E.2d 962 (1991). Recovery under a reimbursement theory requires only a finding that Casualty and/or American States owed coverage to Schal and Buck with respect to the judgment; to wit, that Schal's and Buck's liability to Keegan at least in part arose out of the work by Casualty's and American States' respective insureds (Alcan and Chicago Forming). In such a circumstance, Northbrook, as an excess insurer, should not have had to pay any claim on behalf of Schal and Buck until the Casualty and American States limits were exhausted." *Schal Bovis*, 315 Ill. App. 3d at 363-64.

We believe that *Schal Bovis* expresses the correct view. A subrogation action brought by an excess insurer against a primary insurer is completely distinct from a contribution action. The elements necessary to maintain a contribution action focus prospectively on the "risk" that the parties set out to cover. For a coinsurer to recover, it must have insured the identical risk. In contrast, a subrogation claim only requires that the secondary insurer insure the "same loss" as the primary insurer. This requirement looks retrospectively at the loss suffered. Here, Allied suffered only one loss, and if Allied's liability arose at all out of Western's work then Cincinnati was wholly liable for that loss as the primary insurer, and Home was only secondarily liable for that

loss as the excess insurer. By definition, primary and excess insurers insure different risks. Under the appellate court's approach, an excess insurer would never be able to recover from a primary insurer under a subrogation or reimbursement theory because the parties insure different risks. Cincinnati does not cite any case, nor are we aware of any, that has taken the same approach as the appellate court here. Accordingly, we reverse the appellate court's finding.

We further find that Home was entitled to summary judgment on its equitable subrogation claim as a matter of law. While Home would only be entitled to recovery if it could be shown that Cincinnati owed coverage to Allied because Allied's liability arose at least in part out of Western's work, there is a presumption that the injured worker in the underlying suit would have prevailed on all of his theories of liability where the case is settled prior to trial. *Certain Underwriters at Lloyd's London*, 729 F.2d at 1134 (court was entitled to assume that worker would have prevailed on his design negligence claim if the case had not settled, and in subsequent contribution action, defendant insurance company was asking the "impossible" when it maintained that plaintiff insurance company must show what portion of the settlement was paid to settle the allegation of design negligence).

Here, none of the deposition testimony and affidavits on file were sufficient to create a genuine issue of fact and to overcome the presumption that Allied's liability arose at least in part out of the work of Western. Cunningham admitted in his deposition that Cincinnati paid $40,000 to settle the suit against Western at least in part because of the possibility that Cincinnati might lose its pending summary judgment motion and be found liable to Fisher at trial. Cunningham further acknowledged that there was a chance that Western could have been

found liable in the Fisher suit. He also correctly acknowledged that the "arising out of" language is read broadly in favor of coverage. See, *e.g., Casualty Insurance Co. v. Northbrook Property & Casualty Insurance Co.,* 150 Ill. App. 3d 472, 475 (1986). Moreover, Cincinnati agreed to pay $100,000 toward Allied's settlement with Fisher, presumably because Cincinnati believed that Allied's liability arose at least in part out of the work of Western. Under the circumstances, we find that Home was entitled to summary judgment as a matter of law on its subrogation claim. As we will explain more fully below, we also find that Home waived a portion of this claim.

### III. Waiver

The circuit court found that Home completely waived its subrogation claim by not reserving its rights in the letter to Allied when it accepted the defense of the Fisher suit and by not raising the effect of its being an excess insurer sooner than when it filed the declaratory judgment action.

Waiver arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right. *Crum & Forster Managers Corp. v. Resolution Trust Corp.,* 156 Ill. 2d 384, 396 (1993). A waiver may be either expressed or implied, arising from acts, words, conduct, or knowledge of the insurer. *Crum & Forster Managers Corp.,* 156 Ill. 2d at 396; *Western Casualty & Surety Co. v. Brochu,* 105 Ill. 2d 486, 499 (1985). An implied waiver arises when conduct of the person against whom waiver is asserted is inconsistent with any intention other than to waive it. *Liberty Mutual Insurance Co. v. Westfield Insurance Co.,* 301 Ill. App. 3d 49, 53 (1998). Where there is no dispute as to the material facts and only one reasonable inference can be drawn, it is a question of law as to whether waiver has been established. *Liberty Mutual,* 301 Ill. App. 3d at 53. The failure of a paying insurer to reserve its rights against a nonpaying

insurer may constitute a waiver of the right to equitable remedies. 15 Couch on Insurance 3d § 218:32 (rev. 2004). An insurer desiring to reserve its rights against a second insurer must make this position clear in its correspondence with the second insurer; it is also considered good practice to include such reservation language in any settlement agreement or order, then provide a copy of it to the nonsettling insurer. 15 Couch on Insurance 3d § 218:32 (rev. 2004).

Home argues that the circuit court misapprehended the nature of a reservation of rights. Home notes that the circuit court correctly found that the estoppel doctrine only applies where an insurer breached its duty to defend its insured, and that because Home did not breach any duty to defend, estoppel does not apply. Working from this premise, Home claims that because it did not know the contents of Cincinnati's policy, the circuit court erred in finding waiver with respect to its conduct toward Cincinnati.

We disagree. As stated above, an insurer by its conduct may waive rights against another insurer. Here, Home was presumed to know the contents of its own policy and that it was an excess insurer. Home claims that it did not know the contents of Cincinnati's policy and whether it also contained an excess clause. However, this should not have stopped Home from informing Cincinnati during the Fisher litigation that it would seek full reimbursement from Cincinnati if its policy did not contain an excess clause. The totality of Home's conduct was inconsistent with any claim that it would seek full reimbursement for the Fisher settlement from Cincinnati. Home accepted Allied's defense without a specific reservation of rights and without asserting that it was an excess insurer. Instead, it only asserted that it would share in the cost of Allied's defense and indemnity with Western on a 50-50 basis. Moreover, Home only sought

$300,000 from Cincinnati at the time of the settlement, not the full amount. It also never asserted that it was an excess insurer at the time of settlement.

In *Liberty Mutual*, the nonsettling insurer waived the right to contest the reasonableness of the settlement where it did not indicate that it was concerned about the reasonableness of the settlement at the time it was made. *Liberty Mutual*, 301 Ill. App. 3d at 53. Similarly, we find that Home waived a portion of its reimbursement claim by not asserting it was entitled to anything more than $300,000 at the time of settlement or at any other time in the underlying dispute, including when it agreed to pay Allied on a 50-50 basis with Western. On appeal before this court, Home admits that it agreed to share in the defense and indemnity of Allied on a 50-50 basis with Cincinnati. Home asks for an award of $200,000 if we find that the circuit court was correct in its waiver analysis. Recognizing that we are guided by equitable principles as they apply to the particular facts of this case, we find that Home is entitled to recover $200,000 from Cincinnati—having waived the remainder of its claim.

## CONCLUSION

For the foregoing reasons, we affirm summary judgment for Cincinnati on the equitable contribution claim, but reverse the appellate court on the equitable subrogation claim and find that Home was entitled to summary judgment on its cross-motion. However, Home waived a portion of that claim and therefore can only recover $200,000. Accordingly, we affirm the judgment of the appellate court in part and reverse in part.

*Appellate court judgment affirmed in part
and reversed in part;
circuit court judgment affirmed in part
and reversed in part.*