# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Oshana v. FCL Builders, Inc.*, 2012 IL App (1st) 101628

---

| | |
|---|---|
| Appellate Court Caption | ANWAR OSHANA, Plaintiff-Appellant, v. FCL BUILDERS, INC., Defendant-Appellant (Suburban Iron Works, Inc., Defendant-Appellee). |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-1628 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | December 2, 2011<br><br>January 13, 2012<br>January 27, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from the injuries plaintiff ironworker suffered when he fell from a steel beam at a construction site where his employer had subcontracted to perform the erection work, the trial court properly entered summary judgment for the steel fabricator on the general contractor's contribution claim against the fabricator, since the fabricator did not retain sufficient control over the work of plaintiff or his employer under the retained control exception of section 414 of the Restatement (Second) of Torts to raise a factual question for purposes of precluding summary judgment. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-L-13001; the Hon. Thomas P. Quinn, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Horwitz, Horwitz & Associates, of Chicago (Michael D. Carter, of counsel), for appellant Anwar Oshana.

Prusik Selby Daley & Kezelis, P.C., of Chicago (John P. Prusik, of counsel), for appellant FCL Builders, Inc.

Lindsay, Rappaport & Postel, LLC, of Chicago (William C. Lindsay, Joseph P. Postel, David S. Osborne, and Jay R. Orlowski, of counsel), for appellee.

Panel
JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice R. Gordon and Justice Garcia concurred in the judgment and opinion.

## OPINION

¶ 1     Plaintiff Anwar Oshana and defendant FCL Builders, Inc. (FCL), appeal the circuit court's order granting summary judgment in favor of defendant Suburban Ironworks, Inc. (Suburban). Appellants argue that Suburban, which fabricated and delivered structural steel for a construction project, retained sufficient control over the steel erection work of an independent contractor and, thus, fell within the ambit of the retained control exception of section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 414 (1965)). Specifically, appellants argue that, even though Suburban subcontracted out the steel erection work to the independent contractor, Suburban retained contractual control over the safety of the steel erection work and supervisory and operational control over the steel erection work.

¶ 2     For the reasons that follow, we affirm the judgment of the circuit court.

¶ 3                                   I. BACKGROUND

¶ 4     Plaintiff Anwar Oshana was an ironworker employed by JAK Ironworks (JAK), a steel erection and installation subcontractor. Plaintiff was injured when he fell from a steel beam while working at the Willow Inn project construction site. At the time of his injury, he was working at the first-floor level and was not tied off.

¶ 5     Plaintiff filed a negligence suit based on section 414 of the Restatement (Second) of Torts against defendants: FCL, the general contractor, and Suburban, the steel subcontractor that had subcontracted out the erection work to JAK. FCL filed a third-party complaint for contribution against JAK and a counterclaim for contribution against Suburban. The parties conducted discovery and deposed various witnesses.

¶ 6     According to the subcontract between FCL and Suburban, Suburban agreed to fabricate and erect the structural steel for the project. Suburban, however, could further subcontract out part or all of that work, provided, *inter alia*, that all subcontractors were union,

coordinated their work through FCL, and observed all applicable ordinances and safety standards. Suburban agreed to assume "responsibility for the prevention of accidents to its agents, invitees and employees." Suburban also agreed to "take all reasonable safety precautions with respect to the work to be performed" and "comply with all safety measures initiated by [FCL] and with all applicable laws, ordinances, rules, regulations, and orders of any public authority for the safety of persons or property." Furthermore, Suburban agreed that it "shall at all times maintain a qualified and skilled superintendent or foreman at the site of the work *** [who] shall be dully [*sic*] and legally authorized to represent and act for [Suburban] with respect to all matters in connection with or arising out of work under this Subcontract."

¶ 7　　　In Suburban's subcontract with JAK, JAK agreed to "provide and pay for all labor, materials, tools, plant, supplies, scaffolding, transportation, insurance, taxes, equipment, competent full-time supervision, and all other services and do all things necessary for the proper and complete performance, installation, and construction of all of the work identified in the attached Project Specific Agreement." The project-specific agreement defined that work as "Steel Erection: With Safety Cabel [*sic*] Install & Remove." Furthermore, JAK agreed to be bound by the provisions of Suburban's general contract with FCL and would "perform on behalf of [Suburban] each and all of [Suburban's] obligations under the General Contract in reference to the Work hereby subcontracted to [JAK]." JAK agreed to furnish competent workers and a full-time superintendent to supervise the steel erection work. JAK also agreed to conform its work to the basic safety policy of Suburban and comply with OSHA regulations for the steel erection work and all other applicable codes, rules, ordinances, statutes and similar regulations.

¶ 8　　　Furthermore, JAK agreed to, "at all reasonable times, permit inspection by [Suburban] or Owner or Architect of the work and materials provided under this Subcontract," and "replace or correct any work or materials which [Suburban] or the Owner shall reject as failing to conform to the requirements of [Suburban] of this Subcontract." If JAK failed to make such replacements or corrections, Suburban had the right to do so and hold JAK liable for the costs thereof. In addition, Suburban "may stop the Work whenever such stoppage is ordered by Owner, or its representative, or when, in the sole judgment of [Suburban], such stoppage is necessary to insure the proper execution of the Contract or the Work." JAK agreed to cooperate with and coordinate its work with the work of Suburban and other subcontractors to avoid complications and delays.

¶ 9　　　In his deposition, plaintiff stated that he was working as an ironworker for JAK at the Willow Inn project site for about three weeks before his accident. He attended JAK's safety meetings once a week, and fall protection for ironworkers was discussed at those meetings. He did not remember the accident, did not know what he was doing immediately before the fall, and did not know what caused him to fall.

¶ 10　　　Charles Byro, the JAK foreman and plaintiff's immediate superior, said his crew of ironworkers reported to him and took all their orders and directions solely from him. Looking out for his crew's safety was his responsibility, and he held weekly safety meetings for the JAK employees. On the day of the accident, there were no adverse weather conditions, and Byro did not notice any slippery conditions on the steel or any defects in the steel. Byro and

plaintiff were walking on the beams on their way to take a break. As Byro went down the ladder, he heard something and turned to see plaintiff hit the ground feet first. Byro did not know why or how plaintiff fell. Plaintiff fell about 12 feet. They were not tied off while doing their work on the first floor, which was in conformity with the OSHA requirement that ironworkers working at a height over 15 feet must be tied off. This was also in conformity with JAK and FCL's agreement that ironworkers would not need to tie off on the first floor of iron.

¶ 11　　Byro stated that, according to the custom and practice in the steel erection industry, the steel fabricator was not responsible for erection safety and Suburban was not involved in the decision concerning the type of fall protection that would be used at the jobsite. Furthermore, Suburban did not conduct or attend any safety meetings with JAK. Byro had no discussions with Suburban at all regarding fall protection or how JAK was to do its job. Suburban fabricated the steel and delivered it to the site, and then Byro and his crew took over from there as far as doing all the erection work. Byro's only interaction with Suburban was to discuss deliveries and the next load of iron. Suburban did not have an ongoing day-to-day presence on the jobsite. JAK supplied its own tools and equipment, and Suburban never stopped JAK's work. Suburban never went up to the first-floor level to inspect the iron, and allowing laypeople to do something like that would have been dangerous. In Byro's 30 years of experience, a steel fabricator was never out at the site telling the erector and its crew how to erect the steel and what safety methods to employ.

¶ 12　　Craig Caul, a JAK superintendent, negotiated with Suburban for the steel erection work at the Willow Inn project. He understood that JAK was responsible for ensuring that its workers were working safely. Moreover, the general contractor had the authority to stop JAK's work if it was observed doing something unsafe. Suburban did not give any directives to JAK regarding safety at the jobsite. If JAK had mistakes on the iron, it would contact Patrick Hivon of Suburban, who would decide how to do the fix on the particular beam. He would also tell JAK how to perform any adjustments.

¶ 13　　Mark Hivon, the owner of Suburban, said that Suburban never functioned as a general contractor. Suburban purchased the steel beams, cut them to size, punched holes in them according to the design drawings, and then delivered them to the jobsite. Although the erection work was initially assumed by Suburban in its contract with FCL, Suburban then delegated that work to JAK in a separate subcontract. That arrangement was typical in the steel business. Suburban had never done erection work and had no special knowledge of how to perform steel erection. Rather, Suburban employed a competent subcontractor to perform that work safely and accurately. Suburban did not supervise the erection work or issue any safety directives to JAK.

¶ 14　　Patrick Hivon, a vice president of Suburban, was involved in bidding and coordinating drawings regarding the manufacturing of steel. The only time he was on site was to attend coordination meetings for all the subcontractors on the job.

¶ 15　　Patrick Sinwelski, an FCL project superintendent, testified that it was the custom and practice in the industry for a general contractor to subcontract out the ironwork to a steel fabricator, which in turn would subcontract out the steel erection work. At a preconstruction

meeting, FCL, Suburban and JAK agreed about when fall protection would be required. Sinwelski generally dealt with Patrick Hivon of Suburban, who then would talk to Craig Caul of JAK and convey the information. However, if Sinwelski had concerns on the job regarding the safety of JAK's work, he directed those concerns to Charles Byro of JAK, who was at the jobsite on a daily basis.

¶ 16     Jerry Yankus, an FCL jobsite safety consultant, visited the Willow Inn project and found the ironworkers to be in full compliance with OSHA fall protection provisions.

¶ 17     Suburban filed for summary judgment, contending there was no evidence Suburban had sufficient supervisory, operational or contractual control over JAK's work to give rise to a duty to plaintiff. The circuit court granted Suburban's motion, and plaintiff and FCL appealed.

¶ 18                                        II. ANALYSIS

¶ 19     Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions and any affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). This court may affirm a grant of summary judgment on any basis appearing in the record, regardless of whether the lower court relied upon that ground. *Id*. We review the entry of summary judgment *de novo*. *Id*.

¶ 20     Section 414 of the Restatement (Second) of Torts states an exception to the general rule that a principal is not liable for the acts and omissions of an independent contractor. Under this exception:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

If the employer retains control over the operative detail of any part of the contractor's work, the employer is subject to liability as master under the principles of agency. *Id.* cmt. a. If the employer retains only supervisory control, *i.e.*, the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others, then the employer may be liable under section 414 unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others. *Id*.

¶ 21     When a principal contractor entrusts a part of the work to subcontractors but superintends the entire job through a foreman, the principal contractor is subject to liability if he (1) fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, (2) knows or should know the work was being so done, and (3) has the opportunity to prevent it by exercising his retained power of control. *Id.* cmt. b.

¶ 22     However, the employer is not liable where

"he has merely a general right to order the work stopped or resumed, to inspect its

progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." *Id.* cmt. c.

¶ 23    In a negligence action, the plaintiff must establish the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury to the plaintiff proximately caused by the breach. *Sameer v. Butt*, 343 Ill. App. 3d 78, 85 (2003). Whether a duty exists is a question of law and, under section 414, turns on whether the defendant controls the work in such a manner that the defendant should be held liable. *Kotecki v. Walsh Construction Co.*, 333 Ill. App. 3d 583, 587 (2002).

¶ 24    Plaintiff and FCL argue that summary judgment in favor of Suburban was improper because the initial FCL/Suburban subcontract and subsequent Suburban/JAK subcontract provided sufficient evidence that Suburban retained control of safety of the steel erection, which was sufficient to give rise to a duty of care owed by Suburban to plaintiff. Suburban's scope of work in the initial FCL/Suburban subcontract included both steel fabrication and erection. In that initial subcontract, Suburban agreed to furnish the necessary management and supervision to perform and complete the contract; assumed responsibility to prevent accidents to its agents, invitees and employees; agreed to take all reasonable safety precautions with respect to the work to be performed under the contract; and agreed to maintain at all times a qualified and skilled superintendent or foreman at the site of the work. Plaintiff and FCL contend that those supervisory and safety duties, which Suburban had assumed toward FCL, were not passed on to JAK in the Suburban/JAK subcontract. According to plaintiff and FCL, Suburban was responsible for safety within the scope of its work, and steel erection was included within that scope.

¶ 25    To support their argument that Suburban did not delegate to JAK the obligation to supervise the safe erection of steel, plaintiff and FCL cite various provisions in the Suburban/JAK subcontract. For example, in the Suburban/JAK subcontract, Suburban retained the right to inspect JAK's work and materials and stop JAK's work if necessary to insure proper execution of the work; required JAK to conform to Suburban's safety policy; had the authority to issue safety directives to JAK; and required JAK to replace or correct any work rejected by Suburban as failing to conform to Suburban's requirements. Plaintiff and FCL also argue that Suburban's delegation of the steel erection work to JAK did not relieve Suburban of its responsibilities to FCL, which was not a party to the Suburban/JAK subcontract, because that subcontract did not specifically contain language that relieved Suburban of its responsibilities to FCL if the steel erection was subcontracted out.

¶ 26    In response, Suburban acknowledges that it initially undertook, in accordance with industry custom and practice, contractual responsibility for both the steel fabrication and erection work. However, Suburban, in accordance with the terms of its initial subcontract with FCL, subcontracted out the erection work to JAK, a competent subcontractor, and thereby delegated the supervisory and safety responsibilities attendant to that erection work to JAK.

¶ 27 Under the applicable principles of contract construction, we find that Suburban did not retain responsibility to supervise the safety of JAK's erection work. A contract "should be given a fair and reasonable interpretation based on consideration of all its language and provisions." *Shelton v. Andres*, 106 Ill. 2d 153, 159 (1985). "[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007). "The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Id.*

¶ 28 When seeking to determine the intent of the parties to a contract when its terms are in any respect doubtful or uncertain, courts look to the acts and conduct of the parties in carrying out the provisions of the contract. *Olympic Restaurant Corp. v. Bank of Wheaton*, 251 Ill. App. 3d 594, 602 (1993); *Chicago & North Western Ry. Co. v. Peoria & Pekin Union Ry. Co.*, 46 Ill. App. 3d 95, 101 (1977); *Pocius v. Halvorsen*, 30 Ill. 2d 73, 81-82 (1963). If a contract is susceptible to two constructions, the construction that makes the contract fair, customary and one likely to be entered into by reasonable men is preferred over the construction that renders the contract inequitable, unusual or unreasonable. *Fox v. Commercial Coin Laundry Systems*, 325 Ill. App. 3d 473, 476 (2001).

¶ 29 A plain reading of the applicable contract provisions indicates that Suburban had the authority to delegate the erection work and its attendant supervisory and safety responsibilities to JAK. The subcontract explicitly contemplated that Suburban could subcontract the steel erection and associated safety responsibilities to a steel erector. According to the plain contract terms, Suburban retained responsibility for the steel fabrication work and its attendant supervisory and safety duties but subcontracted out the steel erection portion of the job to JAK, the subcontractor with the specialized expertise in steel erection. Under its subcontract, JAK became responsible for all the means, methods and safety responsibilities for the steel erection portion of the work. JAK was required to provide all tools, competent workers, full-time competent supervision of the steel erection work, and all other services necessary for the steel erection work in compliance with OSHA regulations and the general contractor's safety regulations. Moreover, JAK agreed to be bound by the provisions of the FCL/Suburban subcontract and to perform Suburban's steel erection obligations under the general contract.

¶ 30 The witnesses in this case testified consistently that Suburban subcontracted the entirety of the erection work to JAK, and such an arrangement was typical in steel work. Their undisputed testimony established that it was industry custom and practice that the steel fabricator was not responsible for supervision of the erection work or erection safety.

¶ 31 Moreover, the conduct of the parties in carrying out the provisions of the FCL/Suburban and Suburban/JAK subcontracts establishes that the parties intended that JAK would be responsible for the supervision and safety of the erection work. The testimony of Suburban's vice president and owner established that Suburban never functioned as a general contractor and did not have the expertise to supervise any portion of the steel erection work. Moreover, Suburban's fabrication work was done off-site, so Suburban's limited presence at the jobsite consisted of delivering the steel and attending FCL's coordination meetings with all the other subcontractors. Furthermore, all the ironworkers took all of their directions from their JAK

foreman. Suburban did not supervise or control the means and methods of JAK's work, did not provide equipment or inspect JAK's work, did not have an ongoing presence at the site, and was not present at the time of the accident. JAK's superintendent stated that JAK was responsible for ensuring that its workers were working safely and added that Suburban never gave any directive to JAK regarding safety at the job site. FCL worked directly with JAK on a daily basis and understood that Suburban had subcontracted the erection work to JAK.

¶ 32    Plaintiff and FCL also argue that Suburban retained supervisory and operational control over JAK's work. To support this proposition, plaintiff and FCL argue that discussions among Suburban, FCL and JAK regarding the sequencing of the steel erection showed that Suburban retained control over sequencing the work and, thus, retained control over safety because sequencing was one component of overall jobsite safety. Plaintiff and FCL state that Suburban's Patrick Hivon attended weekly on-site meetings and spoke with the JAK foreman regarding scheduling, deliveries, and how to fix any mistakes or problems with the beams. In addition, FCL superintendent Sinwelski generally spoke first with Patrick Hivon, who then would convey information to its subcontractor JAK.

¶ 33    We find that the above-cited examples of retained control actually establish that Suburban did not retain control over JAK's erection work. As discussed above, Suburban did not have an ongoing presence at the jobsite, and Patrick Hivon was not knowledgeable about steel erection and merely attended FCL's coordination meetings with all the other subcontractors. The evidence in this case overwhelmingly established that Suburban essentially just fabricated the steel and delivered it to the jobsite. Suburban's conversations with JAK regarding how to fix a problem with any particular beam shows that Suburban retained control over the fabrication of the steel but not over the erection of the steel. In accord with comment c of section 414, the facts established that JAK's foreman instructed, supervised and directed the manner in which his crew did their work without interference from Suburban. JAK's foreman said it would have been dangerous to have a layperson like Suburban's Patrick Hivon on the steel conducting inspections, directing the work, or issuing safety directives. Although the FCL project superintendent Sinwelski might have initially contacted Suburban to convey certain information to its subcontractor JAK, Sinwelski spoke directly to JAK's foreman at the jobsite about any concerns regarding the safety of JAK's erection work.

¶ 34    Because the evidence here fails to indicate sufficient control by Suburban over JAK's or plaintiff's work under the retained control exception of section 414, plaintiff and FCL fail to raise a factual question necessary to survive summary judgment. See *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303 (2004) (steel fabricator subcontractor did not retain supervisory or contractual control over the ironworkers' erection of the steel); *Shaughnessy v. Skender Construction Co.*, 342 Ill. App. 3d 730 (2003) (accord). We find, therefore, that the circuit court properly entered summary judgment in favor of defendant Suburban. Accordingly, we affirm the judgment of the circuit court.

¶ 35    Affirmed.