IN RE: CAESARS ENTERTAINMENT OPERATING CO., INC., et al., Debtors.

No. 15 B 1145 (Jointly administered)

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Signed May 28, 2015

Attorneys for debtors Caesars Entertainment Operating Co., Inc., et al.: James H.M. Sprayregen, P.C., David J. Zott,

P.C., David R. Seligman, P.C., Stephen C. Hackney, Jeffrey J. Zeiger, P.C., Kirkland & Ellis LLP, Chicago, IL; Paul M. Basta, Nicole L. Greenblatt, Kirkland & Ellis LLP, New York, NY

Attorneys for Official Committee of Second Priority Noteholders: Brad B. Erens, Timothy W. Hoffmann, Jones Day, Chicago, IL; Bruce Bennett, James O. Johnston, Sidney P. Levinson, Joshua M. Mester, Jones Day, Los Angeles, CA

## MEMORANDUM OPINION

A. Benjamin Goldgar, United States Bankruptcy Judge

This matter is before the court for ruling after a two-day evidentiary hearing on the debtors' application to retain Kirkland & Ellis LLP and Kirkland & Ellis International LLP ("Kirkland" or "the firm") as their counsel. The Official Committee of Second Priority Noteholders (the "Noteholders Committee" or the "Committee") has objected to the application. These are the court's findings of fact and conclusions of law under Rule 52(a)(1) of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 52 (made applicable by Fed. R. Bankr. P. 7052 and 9014(c)). For the reasons that follow, the application will be granted.

### 1. Background

The facts are drawn mostly from the evidence adduced at the hearing and from the court's docket. The few facts not brought out at the hearing involve background matters well known to the parties and not subject to dispute.

The debtors in these jointly administered bankruptcy cases call themselves the primary operating units of the "Caesars gaming enterprise." The debtor named in the caption of the lead case is Caesars Entertainment Operating Company, Inc. ("CEOC"). The debtors in the other cases are subsidiaries of CEOC.

The majority owner of CEOC is Caesars Entertainment Corporation (or "CEC"). The majority owners of CEC (with a combined 64% share) are four limited liability companies: TPG Hamlet Holdings, LLC, TPG Hamlet Holdings B, LLC, Apollo Hamlet Holdings, LLC, and Apollo Hamlet Holdings B, LLC (the "Hamlet entities"). The TPG Hamlet entities, in turn, are wholly owned by TPG Capital LP. The Apollo Hamlet entities are wholly owned by Apollo Global Management, LLC. Apollo and TPG are private equity funds that have interests in a variety of other enterprises, enterprises unrelated to Caesars, that the parties refer to as "portfolio companies."

CEOC's board has seven members. Of those, two are affiliated with Apollo, two are affiliated with TPG, and two are independent. (The seventh was not identified.) The CEOC board has a three-member executive committee. One member is affiliated with Apollo, another with TPG. Six of the nine CEC board members are also associated with Apollo or TPG.

Apollo and TPG acquired their interests in CEC in 2008. Things have not gone well since the acquisition. From 2011 through 2013, CEC and its affiliates had net losses of approximately $5.2 billion. In 2013 and 2014, CEOC and its affiliates therefore engaged in approximately 50 transactions of various kinds described in the record as "capital markets transactions." Depending on one's point of view, these transactions were intended either to increase liquidity and provide CEOC with badly needed capital or to loot CEOC of valuable assets, transferring them to CEC and related companies.

As James Sprayregen, Kirkland's only witness at the hearing, observed, creditors have not been at all shy about initiating lawsuits over the transactions (which the

parties term the "challenged" or "disputed" transactions). The transactions are the subject of several lawsuits pending in New York and Delaware. CEOC's bondholders in particular have criticized the transactions. The unhappy bondholders include the constituents of the Noteholders Committee objecting to Kirkland's application.

At some point, at least in 2014 but possibly earlier, CEOC began to consider restructuring. CEOC also considered retaining counsel in connection with any restructuring effort. One of the law firms under consideration was Kirkland. One of the independent CEOC directors, Ronen Stauber, knew a Kirkland partner, Edward Sassower. Stauber telephoned Sassower, said that he and another man had been appointed independent directors, and said the independent directors were going to interview counsel for a possible restructuring. Stauber wanted to interview Kirkland.

In late June or early July 2014, the Kirkland lawyers made what they call a "pitch" for the CEOC business in a meeting in New York. The pitch was made to the two independent CEOC directors. In connection with the pitch, on June 26 and 27 Kirkland quickly prepared a "pitch book" that was provided to the two independent directors. Because the Noteholders Committee finds the pitch book significant, it is worth summarizing its contents briefly.

The pitch book began with a "situation overview" that described the structure and recent financial performance of the broader Caesars enterprise and also described in general terms the challenged transactions.

The pitch book then set out possible "next steps/action items" for the CEOC board. These included addressing "financial and operational challenges," establishing "an appropriate corporate governance process," and developing a "strategic action plan for likely bondholder challenges." In the first category, Kirkland said (among other things) that it would "work closely with the Board, management, and financial and other advisors to jointly develop cutting edge solutions with creditors to reach a consensual solution." In the second category, Kirkland noted that it was "important to establish and maintain appropriate corporate governance and decision making processes, to facilitate decisions in the restructuring context, and to protect those decisions and the decision makers from challenges . . . ." In the third category, Kirkland offered to assist CEOC and its advisors "to develop an appropriate plan for responding to and defending against the bondholder challenges" to the disputed transactions.

The pitch book's next section was entitled "why hire Kirkland." The firm described itself as "problem solvers" and "deal doers" who focus on "maximizing enterprise value and minimizing costs and disruptions associated with restructuring situations." Kirkland, the pitch book said, was "deal-oriented." But, Kirkland added, it was "prepared to litigate if necessary." At the hearing, Sprayregen confirmed this firm philosophy, stating that "the most value-maximizing solution for most Chapter 11 situations is a holistic, fully consensual deal," but "[a]n important element of reaching consensual resolution has always been the ability and willingness to litigate."

This description of the pitch book covers pages 1 through 17. The remaining 94 pages of the 111–page book (the bulk of the piece, in other words) were devoted to a description of the firm's experience and the credentials of its personnel, complete with rankings of specific Kirkland practice areas from publications like "The American Lawyer" and "U.S. News & World

Report." Fifty-four of the remaining 94 pages (nearly half the pitch book, in other words) consisted of the curricula vitae of assorted Kirkland lawyers.

On or around July 3, 2014, the independent directors apparently decided to hire Kirkland. The decision is embodied in an undated resolution of the CEOC board.

About a week later, Kirkland provided CEOC's general counsel, Tim Donovan, with a draft engagement letter. On July 15, CEOC's deputy general counsel, Scott Wiegand, responded that "we're looking at this letter and will provide comments shortly." There was apparently a discussion of the letter on August 4 involving Donovan, because on August 5 Donovan sent David Seligman at Kirkland an email asking whether there would be a "new, revised engagement letter" in light of "the retainer conversation yesterday." On August 6, Seligman sent Donovan a new engagement letter noting a change in the retainer amount. Around this time, Tim Lambert replaced Donovan as CEOC's general counsel, and in mid–August Lambert and Donovan exchanged detailed e-mails negotiating further changes to the engagement letter.

Kirkland and CEOC at last came to an agreement on the terms of the engagement, and on September 2, 2014, Kirkland and CEOC executed a finalized engagement letter. Sprayregen signed for Kirkland, and Mary Higgins, CEOC's chief financial officer, signed for CEOC.

Two features of the letter are relevant to the retention question. First, the letter acknowledged that Kirkland had been asked to represent "Caesars Entertainment Operating Company, Inc. and its subsidiaries in connection with a potential restructuring." Those entities were defined parenthetically as the "Company." The letter then added: "Please note, the Firm's representation is only of the Company; the Firm does not and will not represent any shareholder, director, officer, partner or joint venturer of the Company." Sprayregen testified without contradiction that Kirkland had never before represented CEOC or its subsidiaries; that Kirkland had never represented and does not currently represent CEC; that Kirkland had never represented and does not currently represent either the Apollo or the TPG Hamlet entities; that Kirkland had never represented and does not currently represent Apollo; and that Kirkland had never represented and does not currently represent TPG.

Sprayregen conceded that Kirkland had represented and still represents several portfolio companies of Apollo and TPG, but he made clear (and again his testimony was uncontradicted) that the representations were and are unrelated to this case. Sprayregen also conceded that Kirkland had represented David Bonderman, a member of the CEOC and CEC boards and a founder of TPG, in an unrelated action involving General Motors. The Kirkland lawyers in this case believed the representation of Bonderman had ended prepetition, but it had not. When the continued representation came to light, Kirkland withdrew from the action and Bonderman secured other counsel. Sprayregen conceded as well that Kirkland had advised on one of the challenged transactions, possibly two, but stressed there had been no involvement in the rest, the vast majority of which had occurred before the firm was even retained.

Second, the engagement letter spelled out (as most engagement letters do) the terms on which Kirkland would be paid. Paragraphs 4 through 6 explained that Kirkland would bill "the Company" (again as defined) for fees based on the firm's regularly hourly rates as well as for certain expenses. Paragraph 7 then declared

that statements for fees and expenses "are typically rendered monthly and, unless other arrangements are made, payment in full is due upon receipt."

Despite these provisions providing for monthly billing, paragraph 8 of the letter was entitled "Retainer" and provided in part:

> The Company will provide to the Firm, a "classic retainer" in the amount of $3,000,000 as defined in *In re Production Associates, Ltd.*, 264 B.R. 180, 184–85 (Bankr. N.D. Ill. 2001), and *In re McDonald Bros. Construction, Inc.*, 114 B.R. 989, 997–99 (Bankr. N.D. Ill. 1990). As such, the classic retainer was earned by the Firm upon receipt. The initial amount of the classic retainer was set to approximate our estimate of fees and expenses expected to be accrued and unpaid by the Company between payment cycles. The Firm's estimate of expected fees and expenses may change based upon actual or expected fees and expenses incurred or expected to be incurred, as applicable. Further, the Company agrees to replenish the classic retainer upon receiving invoices from the Firm so that the classic retainer amount remains at or above the Firm's estimated fees and expenses expected to be accrued and unpaid by the Company between payment cycles. The Firm may request an additional classic retainer depending on the scope of work and estimate of fees and expenses.

Paragraph 9 under the same heading underscored the previous statement that the retainer was earned "upon receipt," declaring that the retainer will be placed in the firm's "general cash account, " the retainer "will not be held in a separate account on your behalf," and "[y]ou have no interest in the classic retainer."

Sprayregen explained the nature of the fee arrangement under the engagement letter, an arrangement that Kirkland has used since 1990 when *McDonald Bros.* was decided. The arrangement's overriding purpose, Sprayregen said, is to ensure that as of the petition date in a bankruptcy case Kirkland is not a creditor of the debtor it seeks to represent and so is not adverse to the estate. This purpose is achieved through the retainer provision, which applies only until the petition date. Postpetition, the provisions concerning fees, expenses, and monthly statements payable on receipt take effect.

Sprayregen added that the retainer scheme described in the engagement letter is designed to avoid a debtor-creditor relationship by keying the amount of the retainer to the value of the services rendered. He testified: "We keep track of our rates-times-hourly fee and compare that against the classic retainer, and we keep the client informed. And then when the rates times hours is approximately getting close to that, we get another classic retainer." To obtain another retainer, Sprayregen said, Kirkland issues an invoice to CEOC. But the invoice creates no receivable for the firm, he added. The invoices "[aren't] bills." Sprayregen's testimony on this point was consistent with the engagement letter's provision that "the Company agrees to replenish the classic retainer upon receiving invoices from the Firm so that the classic retainer amount remains at or above the Firm's estimated fees and expenses expected to be accrued and unpaid . . . ."

In accordance with the engagement letter, CEOC paid Kirkland a $500,000 retainer on July 30, 2014, and an additional $2.5 million retainer on September 4, 2014. Between September 18 and December 22, Kirkland sent CEOC five invoices. In response, CEOC wired funds to Kirkland in the amounts of the invoices. As a result, on December 22, 2014, Kirkland was still

"ahead," to use Sprayregen's term, to the tune of $3 million, the amount of the retainer as of September 4.

As soon as Kirkland was retained in early July, a special governance committee (the "SGC") of the CEOC board consisting of the two independent directors began an investigation of the 50 or so challenged transactions mentioned earlier. Kirkland led the investigation, hiring Mesirow Financial to assist in the effort. (Consistent with the engagement letter, however, Kirkland did not represent the SGC itself any more than Kirkland represented the CEOC board.) The investigation, which is continuing, has involved the review of hundreds of thousands of pages of documents and the examination of 15 to 20 witnesses.

As a result of its efforts, the SGC formed interim conclusions that a number of the transactions were problematic. Specifically, the SGC concluded that CEOC had received insufficient consideration—the transfers, in other words, were constructively fraudulent—and CEOC had grounds to bring an action against CEC. Kirkland shared its conclusions and concerns with CEC. Armed with those conclusions, the SGC (and Kirkland, apparently) negotiated a restructuring support agreement (the "RSA") to which CEOC, CEC, and CEOC's first lien bondholders were parties. Under the RSA, CEC would make contributions to CEOC in an amount the SGC was satisfied met its concerns. (An exact dollar figure was not mentioned, but Sprayregen described the contribution as "substantial.") In return, CEC and its affiliates would be released from liability in connection with the transactions.

The RSA nevertheless contains what Sprayregen described as "two major outs." First, CEOC has the absolute right not to go forward with the RSA if the SGC is not satisfied at the conclusion of the investigation that all relevant information has been provided. Second, CEOC has the right not to go forward if the SGC in the exercise of its fiduciary duties decides there is "an alternative" that is "better than the deal with the RSA."

Despite the SGC's investigation, and despite the interim conclusions that the SGC would later draw about the challenged transactions, CEOC and CEC together brought an action in New York state court on August 5, 2014, seeking as relief, among other things, a declaration that neither company had breached any fiduciary duties or engaged in any fraudulent transfers. An amended complaint seeking the same relief was filed on September 15, 2014. The CEOC board authorized the filing of the action, but the two independent board members abstained. Kirkland does not represent CEOC or CEC in the New York action.

On December 23, 2014, Kirkland received another retainer payment from CEOC, this one for $3 million. Not quite three weeks later, on January 12, 2015, Kirkland received still another retainer payment from CEOC, this one for $2 million. These two retainer payments plus the $3 million retainer Kirkland was already holding meant that as of January 12, Kirkland held a retainer from CEOC totaling $8 million.

On January 12, the same day CEOC paid Kirkland the additional $2 million retainer, three creditors filed an involuntary bankruptcy petition against CEOC in the District of Delaware. The next day, January 13, Kirkland sent CEOC an invoice for $3,753,994.03. The day after that, January 14, Kirkland sent CEOC an invoice for $3.5 million. Then, on January 15, 2015, CEOC and the other debtors filed voluntary chapter 11 petitions in this district. As of the January 15 petition date, Kirkland was still "ahead" by $746,005.97. CEOC owed Kirkland nothing on that date.

After initially staying the voluntary cases here, the bankruptcy court in Delaware determined under Bankruptcy Rule 1014(b), Fed. R. Bankr. P. 1041(b), that all of cases should proceed in this district. The Delaware court lifted the stay and transferred the involuntary case here. All of the cases are pending.

Less than a month after the petition date in the voluntary cases, the debtors (through Kirkland, their proposed counsel) moved to have an examiner appointed. The motion noted that "[s]everal prepetition transactions" involving the debtors and CEC had been "challenged by various creditors and resulted in contentious litigation." Although the debtors themselves had "launched an extensive, independent internal investigation into these transactions," "[a]s fiduciaries with the duty to maximize estate value for all stakeholders" they recognized "the need for a fair process to review the challenged transactions, while avoiding the potential for these cases to devolve into a value-destructive litigation free-for-all." The debtors accordingly sought "the immediate appointment of an independent examiner to thoroughly, expeditiously, and efficiently investigate the prepetition transactions."

Four days later, the Noteholders Committee likewise moved for an examiner. On March 12, both motions were granted in large part, and on March 25, Richard J. Davis was appointed to serve as examiner with broad authority under the March 12 order to investigate the challenged transactions as well as other matters.

Meanwhile, and although the case was barely underway, the debtors filed a proposed joint plan of reorganization on March 2. The proposed plan provides for CEC to make a $406 million cash contribution to the reorganized debtors and possibly as much as $481 million. It also provides for other substantial financial commitments by CEC with a potential value of $969 million. In return, the proposed plan contains releases of CEC, a related entity called Caesars Acquisition Co., and (among others) the shareholders, affiliates, officers, directors, and employees of each. The releases are broad and include any liability arising out of or related to the challenged transactions. These features of the plan are consistent with the RSA.

On February 18, two weeks before the proposed plan was filed, the debtors filed the application that was the actual subject of the evidentiary hearing and is the subject of this decision: the application to retain Kirkland as their counsel in the bankruptcy cases. Of the many vocal creditors in this case, only the Noteholders Committee objected to the application. The U.S. Trustee has not objected. The Statutory Committee of Unsecured Claimholders filed a response specifically expressing no objection and observing that to the extent there were problems, a grant of derivative standing or the use of conflicts counsel could serve as the solution. The debtors have also moved to employ the DLA Piper as conflicts counsel.

The Noteholders Committee contended in its objection that the application to retain Kirkland should be denied for three reasons.

● First, the Committee asserted that Kirkland's "extensive connections" with Apollo and TPG would compromise the firm's ability to be "a vigorous advocate for the Debtors' estates" on occasions when Apollo and TPG have interests adverse to the estates. Specifically, four partners of Apollo and TPG are defendants in the actions creditors have brought over the challenged transactions, and those partners are potentially liable to CEOC in those actions. Because TPG and Apollo have indemnified the partners for any re-

sulting loss, the debtors are adverse to TPG and Apollo in the actions, and Kirkland is therefore adverse to its own clients.

● Second, the Committee argued that Kirkland failed to comply with the disclosure requirement of Bankruptcy Rule 2014, Fed. R. Bankr. P. 2014. That was so, the Committee maintained, because Kirkland had served not only as counsel to CEOC but also as counsel to the SGC, and the relationship with the SGC was not disclosed.

● Third, the Committee argued that Kirkland had an interest adverse to the debtors' estates because of the $7.2 million the firm had received from CEOC on January 13 and 14. Those funds, the Committee said, were property of the estate. Depending on the relevant petition date (January 12 or January 15), the funds were therefore recoverable either under section 542(a) of the Bankruptcy Code, 11 U.S.C. § 542(a) (as property of the estate that had to be turned over), or section 549(a), 11 U.S.C. § 549(a) (as avoidable post-petition transfers).

These were the Noteholders Committee's arguments in its objection. By the time the hearing arrived, however, the arguments had been reduced to two and had changed substantially.

● First, the Committee continued to object to Kirkland's retention on the basis of the firm's connections with Apollo and TPG. Gone, though, was any contention based on Apollo and TPG's indemnification of its partners. Instead, the Committee argued that Kirkland had a demonstrable and disqualifying bias in favor of Apollo and TPG as well as the debtors' non-debtor affiliates (specifically, CEC) and so

would place the interests of those entities above the interests of the debtors and their estates.

● Second, the Committee maintained its objection that Kirkland held an interest adverse to the estate based on the January 13 and 14 "draws" on the retainer. Gone, though, was any mention of section 542(a). Instead, depending on the petition date employed, the Committee insisted that either the issuance of the invoices was void in violation of the automatic stay under section 362(a), or, again, the funds were recoverable under section 549(a) as avoidable post-petition transfers.

### 2. Discussion

The debtors' application to retain Kirkland will be granted. The debtors met their initial burden of demonstrating that the standard under section 327(a) of the Code had been satisfied. The burden then fell to the Noteholders Committee to substantiate its objections to the application. Of the Committee's three arguments for denying the application, the evidence failed to support two of them, and the third was not pursued and so has been forfeited.

### a. Applicable Legal Standard

The initial question is the legal standard for deciding the application. Section 327(a) permits the employment of professionals who "do not hold or represent an interest adverse to the estate, and that are disinterested persons ...." 11 U.S.C. § 327(a). Kirkland and the Noteholders Committee claim they agree on what this standard means. They also claim that courts have distilled the requirements of section 327(a) into a single test that can be expressed in one short, declarative sentence.[1]

---

1. Some courts in the Second Circuit have adopted this single test. *See, e.g., In re Project Orange Assocs., L.C.,* 431 B.R. 363, 370 (Bankr. S.D.N.Y. 2010) ; *In re Granite Partners, L.P.,* 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998). The test requires simply that a professional not "hold or represent an interest adverse to the estate." *Project Orange,* 431 B.R. at 370 (internal quotation omitted).

In fact, Kirkland and the Noteholders Committee do not agree about section 327(a). Kirkland asserts (or asserted at the hearing, at any rate) that an adverse interest sufficient to prevent the retention of counsel must amount to an actual, existing conflict of interest; even a potential conflict is not enough. The Noteholders Committee, by contrast, maintains that a bias against the estate is sufficient.

The most recent explanation of section 327(a) from our court of appeals appears in *In re Crivello*, 134 F.3d 831 (7th Cir. 1998). *Crivello* analyzed the statute as having two requirements, *id.* at 835, which is what the language of section 327(a) suggests. The first requirement is that the professional be a "disinterested person." 11 U.S.C. § 327(a). As *Crivello* observed, section 101(14) defines a "disinterested person" in part as one who "is not a creditor, an equity security holder, or an insider" and who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest, in the debtor … or for any other reason." 11 U.S.C. § 101(14).

█ The "other half of the § 327(a) requirement," *Crivello*, 134 F.3d at 835, is that the professional " 'not hold or represent an interest adverse to the estate,' " *id.* (quoting 11 U.S.C. § 327(a)). Noting that the Code does not define what it means to hold or represent an adverse interest, *Cri-*

*vello* adopted the definition from *In re Roberts*, 46 B.R. 815 (Bankr. D. Utah 1985): " '(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.' " *Crivello*, 134 F.3d at 835 (quoting *Roberts*, 46 B.R. at 827).

*Crivello* is still good law in this circuit. Bankruptcy courts continue to rely on it, *see, e.g., In re Rental Sys., L.L.C.*, 511 B.R. 882, 897 (Bankr. N.D. Ill. 2014); *In re Raymond Prof'l Grp., Inc.*, 421 B.R. 891, 901 (Bankr. N.D. Ill. 2009), and the court of appeals cited the decision with approval as recently as 2012, *see In re Knight–Celotex, LLC*, 695 F.3d 714, 722 (7th Cir. 2012).[2]

The Noteholders Committee is correct, then, that a professional holds or represents an interest adverse to the estate if he has a predisposition under circumstances giving him a bias against the estate. *See Crivello*, 134 F.3d at 835; *In re Southampton Brick & Tile, LLC*, No. 11–75928, 2012 WL 4850048, at *7 (Bankr. E.D.N.Y. Oct. 11, 2012) ("[I]t is possible for an attorney to represent one party on paper, but to represent another party in substance, if the attorney's actions in the case indicate that the attorney is really motivated by a desire to serve the other party."); *see, e.g., In re Vebeliunas*, 231

---

2. One statement in *Crivello* may no longer reflect the court's views. The court in *Crivello* said that the "catch-all" portion of section 101(14)—(the phrase "for any other reason")—is broad enough to "include any professional with an 'interest or relationship that would even faintly color the independence and impartial attitude required by the Code.' " *Crivello*, 134 F.3d at 835 (quoting *In re BH & P, Inc.*, 949 F.2d 1300, 1315 (3d Cir. 1991)). In *Marvel Entm't Grp., Inc.*, 140 F.3d

463 (3d Cir. 1998), however, the Third Circuit said this was a misreading of *BH & P* and rejected the notion that a professional having such an interest or relationship can be disqualified. *Id.* at 477. It is not permissible, the court in *Marvel* said, to disqualify a professional "for a mere appearance of impropriety." *Id.* Whether the Seventh Circuit would interpret section 101(14) the same way after *Marvel* is unclear.

B.R. 181, 193–94 (Bankr. S.D.N.Y. 1999) (disqualifying trustee's counsel for this reason). No case the court's research uncovered supports the debtors' apparent position that section 327(a) is satisfied as long as the professional has no actual conflict of interest. Even the Third Circuit does not go so far, recognizing that "[n]ot every conceivable conflict" warrants disqualification, *Marvel*, 140 F.3d at 477, but holding that disqualification is permitted (though not always required) when there is a potential rather than an actual conflict, *id.* at 476; *see also In re Pillowtex, Inc.*, 304 F.3d 246, 251 (3d Cir. 2002).

 The requirements of disinterestedness and no interest adverse to the estate " 'serve the important policy of ensuring that all professionals appointed pursuant to section 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.' " *Crivello*, 134 F.3d at 836 (quoting *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994)). A debtor has "wide latitude" in selecting counsel, *see In re Hanckel*, 517 B.R. 609, 613 (Bankr. D.S.C. 2014), and his choice will be disturbed "only in the rarest cases," *In re Smith*, 507 F.3d 64, 71 (2d Cir. 2007). Still, section 327(a) must be satisfied. *In re TMA Assocs., Ltd.*, 129 B.R. 643, 645 (Bankr. D. Colo. 1991); *see also Pillowtex*, 304 F.3d at 254. Whether it has been is a case-by-case, fact-specific determination, *In re AroChem Corp.*, 176 F.3d 610, 621 (2d Cir. 1999), one not subject to bright-line rules, *BH & P, Inc.*, 949 F.2d at 1315. The determination rests with the bankruptcy court's discretion. *AroChem*, 176 F.3d at 621.

 The burden of proving that section 327(a) has been satisfied rests with the applicant seeking to retain a professional, as does the initial burden of going forward at any hearing. *In re Big Mac Marine,*

*Inc.*, 326 B.R. 150, 154 (8th Cir. BAP 2005); *In re Running Horse, L.L.C.*, 371 B.R. 446, 451 (Bankr. E.D. Cal. 2007). Under Bankruptcy Rule 2014, the applicant typically meets that burden with its application and the verified statement the rule requires. *See In re Interwest Bus. Equip., Inc.*, 23 F.3d 311, 318 (10th Cir. 1994). Once met, the burden of going forward shifts to the objecting party to show that the professional's employment violates section 327(a). *In re Brennan*, 187 B.R. 135, 145 (Bankr. D.N.J. 1995), *rev'd on other grounds sub nom. In re First Jersey Secs., Inc.*, 180 F.3d 504 (3d Cir. 1999); *cf. In re AOV Indus., Inc.*, 798 F.2d 491, 496 (D.C. Cir. 1986) (adopting this scheme for purposes of retention of committee counsel under section 1103(b)).

#### b. The Debtors' Prima Facie Case

 The debtors met their initial burden. They did so through their application and accompanying verified statements, as well as through Sprayregen's testimony at the hearing.

The application and initial verified statement disclosed the compensation Kirkland had received from the debtors pre-petition, described the retainers Kirkland had received, and declared that the debtors owed Kirkland nothing for legal services before the petition date. The verified statement signed by Seligman described in detail Kirkland's efforts to determine its relationships with the debtors, their creditors, and other parties in interest (including holders of equity interests in the debtors and their affiliates and connections with officers and directors), and the statement disclosed those relationships to the extent there were any. Both the application and verified statement declared that Kirkland was disinterested and neither held nor represented an interest adverse to the debtors' estates for purposes of section 327(a).

The verified statement contained two errors. One was the assertion that Kirkland had "formerly represented Mr. Bonderman" in unrelated matters when in fact Kirkland still represented him. But Seligman filed a further verified statement correcting the error and stating that the representation of Bonderman had been terminated. The other error was that the $2 million retainer had been paid on January 2 rather than January 12, 2015. Seligman filed a further verified statement correcting that error, as well. Neither error gives any reason for concern.

At the hearing, Sprayregen testified similarly that Kirkland represented only the debtors—CEOC and its subsidiaries. Kirkland did not represent and had never represented any other Caesars entity or any equity holder of any Caesars entity. Kirkland had represented and continued to represent affiliates of Apollo and TPG, but those representations, he said, were disclosed in Seligman's verified statement and concerned matters unrelated to the bankruptcy cases. The decision to retain Kirkland had been made by the two independent members of the CEOC board, not by anyone in any way connected with Apollo, TPG, or CEC. Sprayregen testified that he had had no communications of any kind with anyone from Apollo or TPG. Asked "whose side" Kirkland was on in the bankruptcy case, Sprayregen answered: "We are on the side of our client, CEOC, and subsidiaries."

The application and verified Seligman statements, together with Sprayregen's testimony at the hearing, were prima facie proof that Kirkland was disinterested and neither held nor represented an interest adverse to the estates.

### c. The Noteholders Committee's Objections

Because the debtors made their prima facie case, the burden fell to the Noteholders Committee to demonstrate that Kirkland's retention did not satisfy section 327(a). The Committee failed to do so.

### i. Bias Against the Estates

That failure was most evident, ironically, on the Noteholders Committee's main objection: that Kirkland is not disinterested because it has a bias against the debtors' bankruptcy estates. The Committee takes the position that despite Kirkland's ostensible representation of CEOC and its subsidiaries, both the firm and CEOC are really in the pocket of Apollo and TPG and will serve their interests. Those interests, the Committee maintains, are adverse to the interests of the estates. But the evidence supporting the Committee's position was thin at best.

The evidence did show that Apollo and TPG control CEOC, at least indirectly. Apollo and TPG own the Hamlet entities; the Hamlet entities own a combined majority interest in CEC; and CEC owns a majority interest in CEOC. Directors associated with Apollo and TPG also dominate the CEC and CEOC boards.

Standing alone, however, these relationships do not show that Kirkland is other than disinterested. Kirkland represents only CEOC and its subsidiaries, not Apollo, TPG, CEC, the Hamlet entities, or any of the directors of CEC or CEOC. Corporate separateness is a fundamental tenet of American law, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003); *Wachovia Secs., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012), and corporate existence "must be respected," *In re Baker*, 114 F.3d 636, 639 (7th Cir. 1997); *see also International Oil, Chem. & Atomic Workers, Local 7–517 v. Uno–Ven Co.*, 170 F.3d 779, 781 (7th Cir. 1999) (noting "the general common law policy of respecting the separateness of corporations without

regard to common ownership"). These companies cannot be lumped together and treated as if they were a single enterprise doing Apollo and TPG's bidding—not without evidence of a kind the Committee did not present.[3]

The evidence also showed that Kirkland represents Apollo and TPG portfolio companies, although those representations are unrelated to the bankruptcy cases. Kirkland not only represents several portfolio companies, but from 2010 to 2015 (including June 2014 through January 2015, when the firm had been engaged as CEOC's restructuring counsel) Kirkland repeatedly sought legal business from—"pitched," in Kirkland parlance—Apollo and TPG portfolio companies.

But the Committee offered no evidence that the existing representations or Kirkland's interest in additional ones would influence Kirkland's representation of the debtors; the Committee simply left the inference out there to be drawn. The inference is not reasonable. True, some courts have declined to approve the retention of counsel for the debtor when counsel also represented the debtor's principal in unrelated matters. *See In re American Printers & Lithographers, Inc.*, 148 B.R. 862,

865 (Bankr. N.D. Ill. 1992) (citing cases).[4] Kirkland, though, does not represent the debtor's principal—or the principal's principal, or even the principal of the principal's principal. Kirkland represents in unrelated matters companies in which Apollo and TPG, three layers of corporate ownership removed from CEOC, have an interest. Those attorney-client relationships are too remote from the bankruptcy cases to conclude that Kirkland would be predisposed to act adversely to the estates as a result of them.

In addition to the debtors' corporate structure and Kirkland's relationship with Apollo and TPG, the Noteholders Committee contends that, despite what Kirkland claimed, the firm's conduct shows it will favor the interests of CEC and ultimately Apollo and TPG over the interests of the bankruptcy estates. *See Southampton Brick & Tile*, 2012 WL 4850048, at *7. The Committee's counsel insisted in his closing argument that three "super important facts" revealed Kirkland's true allegiance. None of these facts, though, supported the Committee's contention.

First, the Noteholders Committee cited the proposed plan that Kirkland filed for

**3.** The objection of the Noteholders Committee to Kirkland's retention depends on just such lumping. The Committee's counsel asserted in his closing argument: "we are looking at that entire organization. There's no way to slice it and dice it and say, oh, wait a minute. We have connections with some pieces of it. We don't have connections with other pieces of it. The other pieces of it are really the actors." But that "slicing and dicing" is what the law requires in the absence of evidence that corporate separateness and identity should be ignored. *See Uno–Ven*, 170 F.3d at 781.

**4.** Other courts have ruled differently. In *In re Tiffany Square Assocs., Ltd.*, 103 B.R. 337 (Bankr. N.D. Ga. 1988), for example, the court granted the debtor's application to retain counsel although proposed counsel represented the debtor's ultimate parent in mat-

ters unrelated to the bankruptcy case. *Id.* at 338–39. In reaching its decision, the court acknowledged the "potential danger" that counsel's judgment could be influenced but found no conflict or adverse interest. *Id.* at 339 ; *see also In re 7677 East Berry Ave. Assocs., L.P.*, 419 B.R. 833, 848–49 (Bankr. D. Colo. 2009) (granting application to retain counsel although counsel had represented entities related to the debtors in unrelated matters); Bennett L. Spiegel & Monika S. Wiener, *Concurrent Representation of Debtor and Nondebtor Equityholder*, Am. Bankr. Inst. J., Feb. 2015, at 38–39 (arguing that representation of complex webs of affiliated debtors in chapter 11 mega-cases "should be the norm" even when counsel "represents debtors and nondebtors in unrelated matters").

the debtors. The damning provision of the plan, according to the Committee, is the release, which is so broadly worded that it would absolve of liability (including liability in connection with the challenged transactions) CEC, Apollo, TPG, and all of their directors, officers, partners, employees, and agents. Even the Apollo and TPG portfolio companies would be released, the Committee said. Therefore, Kirkland "represent[s] people who are receiving benefits under this plan."

For several reasons, however, the plan lacks the significance the Committee places on it. One, the release is not a gift from CEOC to these entities. Under the plan, CEC must make a nearly $500 million cash payment to CEOC and has other potential financial commitments of as much as $1 billion. Two, although the release may be broad enough to include the portfolio companies Kirkland represents, the Committee offered no evidence that the portfolio companies have any possible liability in connection with the challenged transactions from which they need to be released. To the extent the portfolio companies benefit simply because CEC, Apollo, and TPG, related entities, are released, the benefit is too attenuated to matter. Three, the proposed plan is simply *a* plan. Whether it is *the* plan, meaning the plan the debtors will ultimately seek to confirm, remains to be seen. Section 1127(a) allows a debtor to modify its plan any time before confirmation. 11 U.S.C. § 1127(a). That Kirkland would propose a plan containing a release in exchange for a large sum of money, even a release that might benefit in some remote way companies the firm represents in unrelated matters, does not suggest a bias against the estates.

The second "super important fact" the Noteholders Committee cited was the action that CEC and CEOC filed in New York state court. Although the SGC was already investigating the challenged transactions, the complaint in the action sought a declaration that those transactions involved no fraudulent transfers and breached no fiduciary duties. And critically, the Committee said, the action was filed with CEOC board approval (the two independent directors abstaining) a month after Kirkland began work as CEOC's restructuring counsel, and Kirkland knew about the decision to file it.

The New York action offers even less support for the Noteholders Committee's position than the release in the plan. The New York action does indicate that CEOC believed the challenged transactions were proper. That is hardly a surprise. But it gives no indication of Kirkland's views. Kirkland does not represent CEOC in the action, and there was no evidence that Kirkland played any role in the decision to file it. As the debtors' counsel aptly noted in his closing argument: "We represent CEOC, but we don't control the client .... So the fact that CEC, which owns 90 percent of CEOC, says we're bringing a lawsuit, and they bring a lawsuit for both entities, that's not a Kirkland problem." Calling the situation "amazing," counsel for the Committee maintained that Kirkland should have withdrawn from the representation after the action was filed. But he offered no explanation why, and Kirkland's ethical obligations, if any, in light of the action are not the issue. The issue is whether Kirkland's retention satisfies section 372(a). The New York action, an action in which Kirkland has no involvement, in no way indicates that Kirkland is other than disinterested in these cases.

The third "super important fact" was the pitch book. The Noteholders Committee observed that the book offered as one of the CEOC board's "next steps" the need to "develop a comprehensive plan for responding to" bondholder litigation over the

challenged transactions—and not just "responding to" that litigation but "defending against" bondholder challenges. The pitch book did not suggest the board's next step should be an investigation. The book also touted Kirkland's expertise in "protecting directors and officers," noting the firm's "proven track record of defending directors and officers in and out of the courtroom." Drafts of the pitch book, the Committee adds, were addressed to CEC as the prospective client, not to CEOC. According to the Noteholders Committee, the pitch book shows that Kirkland will act with CEC's interests in mind (and ultimately the interest of Apollo and TPG). The firm has no intention of pursuing any of the challenged transactions.

Though more probative than either the plan or the New York action, the pitch book, too, failed to establish any sort of bias on Kirkland's part against the estates. It is important to remember what the pitch book was. It was a *promotional* piece. An advertisement. A commercial. It was a way of saying: "Things go better with Kirkland." Only 17 pages of the book offered any substance at all about the Caesars enterprise or the work Kirkland might do, and the substance it did offer was very general. The remaining 94 pages were fluff: favorable reviews of the firm, descriptions of past work, and resumes of lawyers. As for the references to CEC as the client in earlier drafts, the pitch book was assembled hastily. ("we were scrambling," Sprayregen said), and the final draft was correctly addressed to CEOC. No inference about Kirkland's state of mind can be drawn from the error. Writers go through drafts because errors like this are inevitable.

Commercial or not, the pitch book's reference to "defending against" bondholder challenges might raise eyebrows—but for Kirkland's work since its representation of CEOC began. No evidence showed that Kirkland had ever advised CEOC or its officers or directors (or anyone else) in efforts to "defend against" bondholder challenges. What the evidence did show was that the SGC had investigated and is still investigating the challenged transactions; that Kirkland had advised and is still advising the SGC in its investigation; that the SGC (again, advised by Kirkland) had concluded that several of the transactions were constructively fraudulent; and that CEOC with Kirkland's assistance had negotiated the return to CEOC of at least half a billion dollars, possibly more. After the bankruptcy cases were filed, Kirkland also moved for the appointment of an examiner to investigate the same transactions. *Cf. Southampton Brick & Tile*, 2012 WL 4850048, at *7 (finding counsel's acquiescence in appointment of examiner alleviated concerns about divided loyalties). What a person does is typically a better indication of his state of mind than what he says.

Should questions arise about CEOC's willingness to pursue claims belonging to the bankruptcy estates, there are better solutions than depriving CEOC of its choice of counsel. One of them is to grant derivative standing. *See Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000); *see, e.g., Raymond Prof'l Grp.*, 421 B.R. at 908; *Southampton Brick & Tile*, 2012 WL 4850048, at *7. The Unsecured Claimholders Committee has already indicated it will request derivative standing to pursue the challenged transactions. Another is the retention of conflicts counsel. *See In re Schwindt*, No. 12–31418, 2013 WL 321297, at *6 (Bankr. D. Colo. Jan. 28, 2013); *Project Orange Assocs.*, 431 B.R. at 375; 3 *Collier on Bankruptcy* ¶ 327.04[5][a] at 327–39 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2015). The debtors have applied to retain conflicts counsel, and that application will be granted.

But the Noteholders Committee did not present evidence demonstrating that Kirkland has a bias against the estates such that CEOC's application to retain the firm should simply be denied.

### ii. Interest Adverse to the Estates

■ The evidence also did not support the Noteholders Committee's contention that Kirkland holds an interest adverse to the estate because of the $7.2 million in "draws" against the retainer on January 13 and 14, 2015. The Committee argues that the retainer was a "security retainer" and belonged to the debtors on the petition date. Kirkland maintains that the retainer was a "classic retainer," and the retainer therefore belonged to Kirkland as soon as it was paid. Of these two positions, Kirkland's is closer to the mark.

■ Illinois recognizes three kinds of retainer agreements between lawyers and clients.[5] *Dowling v. Chicago Options Assocs., Inc.*, 226 Ill.2d 277, 292, 314 Ill. Dec. 725, 875 N.E.2d 1012, 1021 (2007). The first is a security retainer. *Id.* at 286, 314 Ill.Dec. 725, 875 N.E.2d at 1018. A security retainer remains the client's property until the lawyer applies it to charges for legal services that have been rendered. *Id.* Because the retainer is the client's property, it must be deposited in the lawyer's trust account. *Id.* The second is a classic retainer. *Id.* A classic retainer is paid, not for legal services, but to secure the lawyer's availability to perform services. *Id.* A classic retainer is earned when paid and becomes the lawyer's property immediately. *Id.* The third, an advance payment retainer, is something of a hybrid. An advance payment retainer is a

payment in exchange for the commitment to provide future legal services. *Id.* at 287, 314 Ill.Dec. 725, 875 N.E.2d at 1018. Like a classic retainer, ownership of an advance payment retainer "passes to the lawyer immediately upon payment," *id.*; unlike a classic retainer, the retainer is an "advance payment" and so is applied to charges for legal services when rendered, *id.* at 289, 314 Ill.Dec. 725, 875 N.E.2d at 1019; *In re Production Assocs., Ltd.*, 264 B.R. 180, 185 (Bankr. N.D. Ill. 2001); *In re McDonald Bros. Const., Inc.*, 114 B.R. 989, 1000 (Bankr. N.D. Ill. 1990).

The engagement letter between Kirkland and the debtors provided for a retainer, but the letter was ambiguous about the retainer's nature. No fewer than eight times in two paragraphs, the letter termed the retainer a "classic retainer." The letter also declared that the retainer was "earned upon by the Firm upon receipt," that the debtors had "no interest" in the retainer, and that the retainer would not be held in a separate account on the debtors' behalf. At the same time, however, the letter called for Kirkland to issue invoices to the debtors based on the firm's anticipated fees and expenses and required the debtors to "replenish" the retainer on receiving the invoices.

■ The ambiguity results from this invoicing scheme. A classic retainer is paid only to secure the lawyer's availability; it has nothing to do with actual legal services. *In re Stetler Cross Ministries, Inc.*, No. 1:10–CV–00183–R, 2011 WL 1434615, at *2 (W.D. Ky. Apr. 14, 2011); *In re National Magazine Publ'g, Co.*, 172 B.R. 237, 241 (Bankr. N.D. Ohio 1994). Requir-

---

5. Whether Illinois law applies here is debatable. But the parties assume it does, and their assumption is enough. *See Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 692 F.3d 580, 587 n.1 (7th Cir. 2012) (stating that "[w]e do not worry about conflict of laws unless the parties disagree on which state's law applies" (internal quotation omitted)); *Allan Block Corp. v. County Materials Corp.*, 512 F.3d 912, 915 (7th Cir. 2008) (noting that "parties are free to choose (within reason) whatever body of law they want to govern a litigation").

ing a client to "replenish" a retainer suggests the retainer is instead an advance payment retainer. *T&R Foods, Inc. v. Rose,* 47 Cal.App.4th Supp. 1, 56 Cal. Rptr.2d 41, 44 (Cal. App. Dep't Super. Ct. 1996); *see also Production Assocs.,* 264 B.R. at 185; *Dowling,* 226 Ill.2d at 289, 314 Ill.Dec. 725, 875 N.E.2d at 1019. Calling the retainer a "classic retainer" was inconsistent with the issuance of invoices and the requirement that the debtors "replenish" the retainer in response. An internally inconsistent contract is ambiguous. *R.T. Hepworth Co. v. Dependable Ins. Co.,* 997 F.2d 315, 318 (7th Cir. 1993).[6]

Because the agreement is ambiguous, extrinsic evidence can be considered to determine the parties' intent. *Thompson v. Gordon,* 241 Ill.2d 428, 441, 349 Ill.Dec. 936, 948 N.E.2d 39, 47 (2011). The evidence at the hearing suggested that the retainer was in fact an advance payment retainer. Sprayregen explained that the purpose of the retainer was to ensure Kirkland never became a prepetition creditor. That is a common practice in chapter 11 cases, an entirely proper goal—and a common reason to employ an advance payment retainer. *Barron,* 432 F.3d at 596 n.5; *In re Marriage of Earlywine,* 374 Ill.Dec. 947, 996 N.E.2d 642, 648 (2013). Sprayregen also admitted that the purpose of the retainer was not only to ensure Kirkland's availability (the sole purpose of a classic retainer) but also to serve as "an insurance policy against nonpayment" of fees.

Even more probative was evidence of how Kirkland and the debtors operated under the engagement letter. *See Chicago & N.W. Ry. v. Peoria & Pekin Union Ry.,* 46 Ill.App.3d 95, 101, 4 Ill.Dec. 468, 360 N.E.2d 404, 407 (3d Dist. 1977); *see, e.g., Barron,* 432 F.3d at 596 (finding retainer

was advance payment retainer based on the operation of the lawyer's practice). Each time Kirkland issued an invoice to the debtors, the firm netted the amount of the invoice against the retainer it was holding, reducing the balance of the retainer accordingly. Effectively, then, Kirkland paid itself from the retainer. Sprayregen denied this, insisting the invoices were not "bills" and so the reductions were not "draws" against the retainer. But if the retainer was a classic retainer that served only to make Kirkland available to the debtors, there should have been no connection at all between the retainer and any fees the debtors were incurring. In this respect, the engagement letter's use of the word "replenish" was telling. A supply of something (here, money) needs no "replenishing" unless it has been depleted.

In the end, though, the question is academic: it makes no difference for current purposes whether the retainer was a classic retainer or an advance payment retainer. The critical question is whether the retainer became Kirkland's property on payment, as the engagement letter said, or was property of the debtors' estates on the petition date. Like a classic retainer, an advance payment retainer is earned on receipt and does not become property of the client's bankruptcy estate. *Barron,* 432 F.3d at 596; *In re King,* 392 B.R. 62, 71 (Bankr. S.D.N.Y. 2008); *McDonald Bros.,* 114 B.R. at 998–1000. Because the retainer was at the very least one or the other, it was not property of the bankruptcy estates here, and Kirkland holds no interest adverse to the estates.

The Noteholders Committee insists that the retainer was neither a classic nor an advance payment retainer but was a security retainer. If so, the retainer (to the

---

**6.** Calling a retainer a "classic retainer," of course, does not make it one. *Barron v. Countryman,* 432 F.3d 590, 596 (5th Cir. 2005).

Neither does stating that the retainer is earned upon payment and is nonrefundable. *National Magazine,* 172 B.R. at 240.

extent unearned) did become property of the estates. *See Barron*, 432 F.3d at 595–96; *White v. Coyne, Schultz, Becker & Bauer, S.C. (In re Pawlak)*, 483 B.R. 169, 177 (Bankr. W.D. Wis. 2012); *McDonald Bros.*, 114 B.R. at 999. The Committee argues that the retainer could not have been an advance payment retainer because it did not meet the requirements for one under *Dowling* or under Rule 1.15(c) of the Illinois Rules of Professional Conduct, Ill. R. Prof'l Conduct 1.15(c) (2010).

The Committee is partly right. The engagement letter did not meet the requirements of *Dowling* or Rule 1.15(c). *Dowling* said that an agreement for an advance payment retainer must use that term and must declare that the retainer becomes the lawyer's property when paid. *Dowling*, 226 Ill.2d at 293–94, 314 Ill.Dec. 725, 875 N.E.2d at 1022. The agreement must also advise the client that he has the option of a security retainer, must advise the client that the type of retainer is the client's choice, and must set forth the "special purpose" behind the retainer and explain why an advance payment retainer is advantageous. *Id.* Rule 1.15(c), adopted after *Dowling*, imposes these requirements and adds that the agreement must describe the manner in which the retainer will be applied and state that any unearned portion of the retainer will be refunded. Ill. R. Prof'l Conduct 1.15(c)(3), (4) (2010). The engagement letter here did none of these except to provide that the retainer became Kirkland's property.

But the engagement letter's failure to satisfy *Dowling* or Rule 1.15(c) does not transform the retainer into a security re-tainer. In *Hannafan & Hannafan, Ltd. v. Bloom*, 355 Ill.Dec. 547, 959 N.E.2d 1280 (Ill. App. Ct. 1st Dist. 2011), the court held that the elements *Dowling* suggested for advance payment retainers were indeed only suggestions; strict compliance with them was unnecessary. *Id.*, 355 Ill.Dec. 547, 959 N.E.2d at 1284–85. The requirements of Rule 1.15(c), on the other hand, are mandatory. *See In re Vrdolyak*, 137 Ill.2d 407, 421, 148 Ill.Dec. 243, 560 N.E.2d 840, 845(1990) (holding that the predecessor Code of Professional Responsibility "operates with the force of law"). That said, however, the Rule is a rule governing the conduct of lawyers. It is not a set of guidelines for interpreting retainer agreements, and the Rule says nothing about the consequences of failing to meet its requirements.[7]

Retainer agreements are instead interpreted the same way any contract is: under *Dowling*, the central question is the intent of the parties. *Dowling*, 226 Ill.2d at 295–96, 314 Ill.Dec. 725, 875 N.E.2d at 1023; *see also Hannafan & Hannafan*, 355 Ill.Dec. 547, 959 N.E.2d at 1285. Only when the intent to create an advance payment retainer is unclear should an agreement be deemed to create a security retainer. *Dowling*, 226 Ill.2d at 294–95, 314 Ill.Dec. 725, 875 N.E.2d at 1022–23. Since the engagement letter between Kirkland and the debtors explicitly provided that the retainer was earned on payment and the debtors had no interest in it, the intent was plainly *not* to create a security retainer. The invoicing scheme, meanwhile, coupled with its requirement

---

7. Those consequences appear later in Rule 8.4(a), which deems the violation of any of the rules to be professional misconduct. *See* Ill. R. Prof'l Conduct 8.4(a) (2010). The Preamble to the Rules also makes clear that the violation of a Rule is no more than that. It gives rise to no cause of action, provides no basis for civil liability, and does not necessarily warrant "disqualification of a lawyer in pending litigation." Ill. R. Prof'l Conduct, Preamble at ¶ 20 (2010).

that the debtors "replenish" the retainer, shows an intent to create an advance payment retainer.[8]

Any other conclusion would be divorced not only from reality but from the policy the court in *Dowling* sought to promote. Both the *Dowling* elements and the requirements of Rule 1.15(c) are meant to protect clients. *See Dowling*, 226 Ill.2d at 292, 314 Ill.Dec. 725, 875 N.E.2d at 1021 (declaring that "the guiding principle ... should be the protection of the client's interests"); Ill. R. Prof'l Conduct 1.15, comt. ¶ 3D (2010). The clients here are a sophisticated public company and hundreds of its subsidiaries. The company has in-house counsel who negotiated with Kirkland over the engagement letter and its retainer provision for nearly two months. The clients here need no protection. Nor, it is worth noting, are the clients complaining about the retainer. Neither *Dowling* nor Rule 1.15(c) should be interpreted to preclude an advance payment retainer when the client agrees the retainer "provides the best protection of his interests." *Hannafan & Hannafan*, 355 Ill.Dec. 547, 959 N.E.2d at 1285 (making this observation about *Dowling* ).[9]

Just as the evidence did not demonstrate that Kirkland has a bias against the estates, it did not demonstrate that Kirkland's draws under its retainer agreement with the debtors gave the firm an interest adverse to the estates.

### iii. Nondisclosure

The Noteholders Committee's final argument—that the debtors' application and verified statements failed to disclose Kirkland representation of the SGC, as Rule 2014 required—is quickly dispatched. Because the Committee did not pursue the argument after making it initially, the argument has been forfeited. The evidence at the hearing did not support the argument in any event.

Bankruptcy Rule 2014 requires a professional seeking to be employed in a case to file a verified statement disclosing "the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Fed. R. Bankr. P. 2014; *see generally Rental Sys.*, 511 B.R. at 893–94. The disclosures must be detailed enough to permit the court to determine whether section 327(a) has been satisfied. *In re Renaissance Residential of Countryside, LLC*, 423 B.R. 848, 857 (Bankr. N.D. Ill. 2010). Failing to make the necessary disclosures or disclosing falsely can have seri-

---

8. If the retainer in the engagement letter lacked the *Dowling* elements of an advance repayment retainer, it also failed to comply with the critical requirement for a security retainer—that the retainer "be deposited in a trust account and kept separate from the lawyer's own property." *Dowling*, 226 Ill.2d at 286, 314 Ill.Dec. 725, 875 N.E.2d at 1028 ; *see also* Ill. R. Prof'l Conduct 1.15(c) (2010). The Noteholders Committee does not explain how the retainer could be considered a security retainer when it did not have this crucial feature.

9. The only party contesting the nature of the retainer is the Noteholders Committee. As the court in *Hannafan & Hannafan* pointed out, "[t]he *Dowling* court sought to protect the interests of clients, not third-party creditors." *Id.*; *see also* Ill. R. Prof'l Conduct, Preamble at ¶ 20 (2010) (stating that the applicability of a Rule of Professional Conduct "does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule" and observing that "the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons").

ous consequences: disqualification from employment, *see In re Tinley Plaza Assocs., L.P.*, 142 B.R. 272, 278–80 (Bankr. N.D. Ill. 1992), revocation of employment previously approved, *see Crivello*, 134 F.3d at 836, denial of compensation, *see id.* even criminal prosecution, *see United States v. Gellene*, 182 F.3d 578, 585–86 (7th Cir. 1999). Had the Noteholders Committee pursued its argument based on Kirkland's undisclosed representation of the SGC, and had the evidence supported it, it might have been necessary to deny the debtors' application.

 But the Noteholders Committee did not pursue the argument. The Committee made the argument in its objection to the debtors' application and never mentioned it again. The Committee did not make the argument in its trial brief and did not introduce any evidence in support of it at the hearing.

Because the argument was not pursued, it has been forfeited. Paragraph 5(c) of the final pretrial order entered in connection with the hearing warned: "Any legal claim, theory, or argument not raised and thoroughly discussed in a party's trial brief with appropriate citations to legal authority will be deemed forfeited." The Committee's argument about the SGC was not raised in its trial brief at all, let alone thoroughly discussed. The final pretrial order aside, it is well established that "[a]rguments a party fails to raise, or raises but then fails to press responsibly throughout the litigation," are forfeited. *In re Commercial Loan Corp.*, 316 B.R. 690, 699 (Bankr. N.D. Ill. 2004); *see also In re Bauman*, No. 11 B 32418, 2014 WL 816407 at *9 (Bankr. N.D. Ill. March 4, 2014) (citing *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013)). The Committee's argument was raised early on but not pressed throughout the proceeding.

 The evidence at the hearing did not support the argument in any event. Sprayregen testified that Kirkland does not represent and had never represented the SGC. Kirkland had assisted and advised the SGC in its investigation, but the SGC was not the firm's client. Kirkland had advised the SGC, just as the firm advises CEOC's board and other board committees, in connection with the firm's representation of CEOC. The Noteholders Committee introduced no evidence to the contrary.

Because the Rule 2014 argument has been forfeited, and because the evidence showed Kirkland does not represent and has never represented the SGC, there is no non-disclosure problem that might warrant the denial of the debtors' application to employ the Kirkland firm.

### 3. Conclusion

The debtors' application to retain Kirkland & Ellis LLP and Kirkland & Ellis International LLP as their counsel in these bankruptcy cases is granted, effective January 15, 2015. The debtors are authorized to retain Kirkland in accordance with the terms and conditions set forth in the application and the engagement letter. Kirkland may apply for compensation for services rendered and reimbursement of expenses in accordance with sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the court, and the compensation procedures adopted in these cases.